**The GILLETTE COMPANY**

v.

**Peter S. WILLIAMS.**

**Civ. No. 15452.**

United States District Court,
D. Connecticut.

May 17, 1973.

Donald F. Keefe, Peter A. Kelly, Tyler, Cooper, Bowerman, Grant & Keefe, New Haven, Conn., Rynn Berry, John E. Nathan, Fish & Neave, New York City, for plaintiff.

David S. Maclay, Norman K. Parsells, Raymond W. Beckwith, Marsh, Day & Calhoun, Bridgeport, Conn., W. R. Glendon, c/o Royall Koegel & Wells, New York City, for defendant.

RULING ON APPLICATION FOR A PRELIMINARY INJUNCTION *

ZAMPANO, District Judge.

In this contract action for damages and injunctive relief, the plaintiff, The Gillette Company ("Gillette"), has filed an application for a preliminary injunction pending the outcome of a full trial on the merits of its claim that the defendant violated the provisions of a post-employment restrictive covenant. In effect, Gillette seeks to restrain its former employee, Peter S. Williams, from continuing to work for a competitor, the Warner-Lambert Company, Schick Safety Razor Division ("Schick").

In addition to the submission of affidavits, the Court has had the benefit of seven days of testimony, comprehensive briefs, and the oral arguments of counsel. At the conclusion of Gillette's case-in-chief, it was agreed that the matter should stand in recess until the Court ruled on defendant's contention that Gillette's evidence failed to demonstrate a right to relief. See Rule 41(b), F.R. Civ.P.; Tr. 463–470. The issue before the Court is a narrow one: Has the plaintiff established a prima facie showing that the defendant breached a post-employment restrictive covenant signed as a condition of his employment with Gillette.

It is the Court's opinion that on the present state of the record the plaintiff has presented sufficient evidence to bar a dismissal of its application for a preliminary injunction. The Court hastens to add, however, that its findings of fact and conclusions of law are founded in large degree solely on the plaintiff's evidence. The Court's ruling in no way reflects a judgment on the application after the defendant has had an opportunity to offer evidence in his own behalf.

I. *Findings of Fact*

For the purposes of the instant motion, the following facts are found.

1. The plaintiff, The Gillette Company, is a Delaware corporation having its principal place of business at Boston, Massachusetts.

2. Gillette Industries Limited ("Gillette-England"), a wholly-owned subsidiary of Gillette, is a limited liability com-

---

* After this Ruling On Plaintiff's Application For A Preliminary Injunction was prepared, but before it was filed, the parties resolved their differences and a Stipulation of Dismissal of the action was filed on May 11, 1973. The instant Ruling is being filed at the request of the parties and pursuant to this Court's Memorandum Order, dated March 21, 1973.

pany organized and existing under the laws of England.

3. The defendant, Peter S. Williams, is a citizen of the United Kingdom who is now residing in Stratford, Connecticut. In 1945, he graduated from Imperial College in London, with degrees in physics and mathematics.

4. Gillette and Gillette-England are engaged in the business of developing, manufacturing and marketing a large variety of personal care products, including safety razors and blades, toiletries, cosmetics, hair waving, hair treatment and hair grooming products and surgical and medical products. Gillette and Gillette-England carry on research and development work relating to such products on a cooperative basis.

5. During the past nine years, Gillette expended approximately one hundred million dollars on research and development, eight million of which was spent directly by Gillette-England.

6. Although some of the fruits of this research are now common knowledge or have been disclosed to the public through patent procedures, other information still remains which Gillette considers confidential and in need of protection. Even the defendant acknowledged at one point in his testimony before this Court that over the last decade his former employer had acquired secrets in the wet shave field which were embodied in plans for the introduction of future products, including new technology and manufacturing expertise (some of which was developed negatively in learning what research avenues were *not* worthy of pursuit) and were also contained in pending patent applications. (Tr. 122–154).

7. Gillette-England's laboratory where Williams worked takes special security precautions to prevent research "leaks." Besides the standard non-disclosure agreement which all employees were required to sign, visitors to the facility had to "sign in" and be accompanied by authorized personnel, security guards were posted at the gates, identification passes were issued to employees, certain reports were marked "confidential," and it was company policy to have technical information disseminated within the premises on a "need-to-know basis."

8. In addition, as a condition of their employment, Gillette employees who may have access to what Gillette considers to be confidential information are required to execute agreements designed to prevent the company's secret information from falling into the hands of Gillette's competitors. (Tr. 117, 313, 319–321). At Gillette-England, these employee agreements are of two types. The first (exemplified by plaintiff's exhibit 2) is a standard non-disclosure agreement enjoining the employee, both during and after his employ, from disclosing or using confidential and secret information of either Gillette-England or plaintiff Gillette. Such agreements are required of all Gillette-England employees who are on the monthly payroll and certain others such as draftsmen. (Tr. 507).

9. In addition to the foregoing non-disclosure agreement, Gillette-England requires that a few selected technical employees sign "Special Agreements" (exemplified by plaintiff's exhibit 3). These Special Agreements are commonly referred to in the United States as post-employment restrictive covenants or employee agreements not to compete. Such agreements, in use at Gillette-England since approximately 1960, are required only of those few selected employees in the fields of manufacturing and research and development who have intimate knowledge of, or access to, what the company regards to be important Gillette confidential information. Of the more than 3,000 persons currently employed by Gillette-England, only 45 have been required to execute Special Agreements. (Tr. 301). However, it is still the practice of Gillette-England to require agreement to similar provisions for certain applicants in designated technical areas.

In a typical Gillette Special Agreement (such as the one involved in this

action) the employee covenants separately with both the plaintiff and Gillette-England that for a two-year period following termination of employment with Gillette-England, the employee will not, without the written consent of Gillette-England, engage in or be employed by a company engaged in research and development or manufacture in a specific field. If consent for such employment is requested and refused, Gillette and Gillette-England covenant to pay the employee one-half his final Gillette-England salary until the expiration of the two-year period. During that period the employee is free to supplement these payments by accepting employment outside the field designated in the Special Agreement.

10. In August, 1961, Williams entered the employ of Gillette-England after having worked as a scientist for 13 years at Imperial Chemical Industries, Ltd. He had had no prior experience in the wet shave field, i. e., safety razors and blades, as opposed to the "dry shave" aspect of the business consisting primarily of the research, development and manufacture of electric razors.

11. Williams' first position with Gillette-England was senior scientist and group leader of the Gillette Research Laboratory of Gillette-England located at Reading, England. (Tr. 85).

12. Before he began work at Gillette-England, Williams signed a non-disclosure agreement of the type described in paragraph 8, supra. (Tr. 100, 117). Williams' execution of this agreement was expressly made a condition of his employment. (Tr. 117). In his non-disclosure agreement, Williams agreed both during and after his employment with Gillette-England not to "use . . . or divulge . . . any matter concerning the confidential affairs or secrets of [Gillette-England or the plaintiff] or any confidential information relating thereto . . . ." (Plaintiff's exhibit 2, ¶¶ 1, 2).

13. In November, 1961, Williams was transferred to the Product and Process Development Group located at Isleworth, England. Because in Gillette's opinion this position put Williams in intimate contact with important confidential Gillette wet shave data, he was required to sign a Special Agreement for the wet shave field of the type described in paragraph 9, supra. (Tr. 88, 117, 124). This document, dated November 14, 1961 (plaintiff's exhibit 3), provides in pertinent part:

3. [Williams] hereby covenants with [Gillette-England] and as separate covenants with [plaintiff Gillette]:

(a) that [for two years following termination of his employment with Gillette-England] he will not without the consent in writing of [Gillette-England] be employed by or act as officer of or adviser to any person firm or Company engaged in the manufacture of safety razors or blades therefor in the United States of America or for sale therein.

(b) that during the said period of two years he will not without the consent in writing of [Gillette-England] be engaged in the United States of America directly or indirectly either as principal partner employee or adviser or otherwise howsoever in research or development work on or the manufacture of safety razors or blades therefor.

In return, the Gillette organization agreed to pay Williams one-half his final Gillette salary for the duration of the two-year period if during that time he wished to accept employment proscribed by the agreement and to which Gillette objected. (Plaintiff's exhibit 3, ¶7). In addition, Gillette paid Williams 50 English pounds upon the execution of the Special Agreement and on each anniversary thereof until his employment with Gillette-England terminated. (Tr. 118–119).

14. From 1961 to 1968, Williams held important and sensitive supervisory positions wherein he was continuously ex-

posed to confidential and secret information of the Gillette organization in the wet shave field. (Tr. 124). For example, from 1962 to 1967 he was the head of the development department of the Gillette Company at Isleworth, and his primary duties related to razors and blades.

15. In January, 1968, Williams assumed new duties and was placed in charge of the Gillette Development Laboratory, the principal function of which was research and development for a proposed Gillette electric razor in the dry shave area of Gillette's business. (Tr. 90–91, 182–183). While head of the Development Laboratory, Williams reviewed work done by a Product Evaluation Group, some of which involved wet shave materials.

16. In 1970, Williams was named "Group Manager" in the United Kingdom Research and Development Laboratory and directly supervised four divisions of that laboratory: (1) Polymer Chemistry; (2) Chemical Products; (3) Product Design and Presentation; and (4) Technical Process and Engineering. Although administrative in nature, his duties in this new position brought him into contact with information and reports concerning the wet shave business which both Williams and Gillette considered confidential. Williams admitted he had received reports relating to wet shaving in 1971 and 1972, and testified as follows:

Q. And those reports contained confidential information, did they not?

A. Confidential, yes.

Q. Information, as far as you know, which is still confidential?

A. I would certainly think so, yes.

Q. And these reports were read by you?

A. They were read by me.

Q. And copies of them were kept by you in your office, were they not?

\* \* \* \* \* \*

A. Yes, that's right. I had access. (Tr. 128–129; see also 160).

17. In 1970, various personnel changes had occurred at Gillette which caused Williams to be concerned about his future with the company and he actively began looking for other employment. In November, 1971, Schick offered Williams a position, which Williams accepted in May, 1972. (Tr. 155–156). On May 24, 1972, Gillette's legal department sent Williams a letter, reminding him of his post-employment restrictive covenant with Gillette.

18. Williams' employment with Gillette-England was terminated on the ground of "redundancy", effective May 31, 1972.

19. Schick is a direct and substantial competitor of Gillette in the development, manufacture and marketing of safety razors and blades.

20. Since July, 1972, Williams has been employed by Schick to establish and supervise a research and development department relating to safety razors and blades, among other products.

21. At the time Williams entered the employ of Schick, he agreed to be bound by the terms of Schick's standard non-disclosure contract as a condition of his new employment. In it, Williams promised, *inter alia*:

I will hold and keep in strict confidence and secrecy, unless otherwise expressly directed in writing by [Schick], all information and knowledge pertaining to the business of [Schick], which I acquire in the course of my employment, and which [Schick] has or may designate as confidential. (Plaintiff's exhibit 5, ¶ 5).

Although Williams signed no Special Agreement for Schick equivalent to Gillette's post-employment restrictive covenant, he did further agree in the above contract to assign to Schick "any invention made or idea . . . conceived . . . [within] two years after my said employment [termination], which inventions or ideas pertain to the business of [Schick]." Ibid., ¶ 3.

22. At the time Williams accepted the job with Schick he knew that his new employer was engaged in the manufacture and sale of safety razors and blades in the United States and he was further aware that in his new position with Schick he would be responsible for establishing and supervising the research and development department referred to in ¶ 20, supra.

23. Williams did not, either before or after accepting employment with Schick, request the consent of the plaintiff or of Gillette-England to such employment.

24. On September 26, 1972, Gillette sent written notices to the defendant and his new employer objecting to his employment at Schick and reiterating its willingness to provide the two-year compensation referred to in paragraph 13, supra. Despite receipt of said letter, Williams has continued to work for Schick.

25. On October 31, 1972, Gillette and Gillette-England filed suit against Williams and the Warner-Lambert Company in the Connecticut Superior Court. Gillette voluntarily withdrew that action on November 20, 1972, and commenced the instant action on that same day.

## II. *Conclusions of Law*

1. The plaintiff properly invokes this Court's diversity jurisdiction provided by 28 U.S.C. § 1332(a); the requisite jurisdictional amount is not in controversy.

2. The plaintiff has established a prima facie case that:

a) The post-employment restrictive covenant is reasonable and properly limited in duration and scope;

b) Williams had access to and was reasonably likely to retain confidential information relating to Gillette's wet shave business at the time he left its employ which would be beneficial to a competitor;

c) There is a substantial threat of disclosure of the confidential information to Gillette's competitor, Schick;

d) Gillette will suffer possible irreparable harm unless injunctive relief is granted;

e) It will probably succeed on the merits at trial; and

f) The balance of hardships tips decidedly in favor of the plaintiff.

3. Serious and difficult questions have been raised on the merits and on the credibility of the defendant which require a more deliberate investigation and decision after the defendant presents evidence.

4. The defendant's motion for a dismissal of the plaintiff's application for a preliminary injunction, presented after the plaintiff's presentation of evidence, must be denied.

## III. *Discussion*

The parties agree that the law applicable to the issues is the law of the United Kingdom; they further agree, however, that the law of the State of Connecticut is substantially similar to the English law. Both parties cite English and American authorities interchangeably in support of their respective positions.

### 1. *Reasonableness of the Covenant*

■■ The Court recognizes that the post-employment restrictive covenant is a contract in restraint of trade and, as such, is the subject of special judicial scrutiny. It seems clear that the plaintiff has established the reasonableness of the post-employment restrictive covenant. The highly competitive, specialized and secret nature of Gillette's wet shave business justifies its extraction of such agreements from certain employees to protect its legitimate business interests. Cf. Schneider Hill & Spangler, Inc. v. Cudmore, 325 F.Supp. 173, 177 (D.Conn.1971); May v. Young, 125 Conn. 1, 6–7, 2 A.2d 385 (1938); Mitchel v. Reynolds, 1P. Wm. 181, 24 Eng. Rep. 347 (W.B. 1711); 43 A.L.R.2d 149.

By his own admissions, Williams had access to and acquired knowledge of many trade secrets concerning the wet shave business during certain years of his employment. At the time the parties entered into the contract containing the restrictive covenant, it was reasonable to assume that a key employee, as Williams was, might be familiar with valuable confidential information if he subsequently left Gillette's employment to work for a competitor. Recognizing that it would be virtually impossible to avoid or detect his divulging such information to a competitor, Gillette understandably required Williams to sign the agreement as a condition of employment in order to protect its competitive position in the market. See printers & Finishers Ltd. v. Holloway, 1 W.L.R. 1, 6 (1965); Blake "Employee Agreements Not to Compete," 73 Harv.L.Rev. 625, 669–70 (1960).

.Williams received an added consideration for signing the restrictive covenant; the two-year limitations period was more than reasonable considering the nature of Gillette's business; the territorial scope of the provision was necessary to protect Gillette's international market position; and there was no financial oppression in the event Williams had to accept a position outside the wet shave field at a lesser salary.

There is little question in the Court's mind that when Williams entered the Gillette organization in 1961, it was reasonably necessary for the proper protection of Gillette's wet shave business that Williams execute the negative covenant in question. Cf. Universal Winding Co. v. Clarke, 108 F.Supp. 329, 333 (D.Conn. 1952). Furthermore, the plaintiff has shown through Schick's own declarations and actions the reasonableness of the Special Agreement. Schick's president expressed the view that "wet shave razor blade business is highly specialized and requires expertise in a very narrow art." Accordingly, Schick also deemed it advisable to require its employees to assign inventions to it developed within two years following departure from the company.

2. *Access To and Possession Of Confidential Information*

The most strongly contested issue between the parties concerns Williams' access to or possession of Gillette's confidential information during the period 1968 to 1972. In lengthy, comprehensive briefs, each party, with remarkable ingenuity, excerpts language from the leading English and American cases to support their respective positions. Fine lines are drawn between "access to" and "possession of" confidential information by Williams at the time he entered Schick's employ.

The primary concern of the Court, however, is the context in which each of the cited cases arose. A careful review of the leading authorities reveals that there is a distinction between actions seeking enforcement of an employee's agreement not to compete, such as the one pending before this Court, and a tort claim for a trade secret misappropriation. See E. W. Bliss Company v. Struthers-Dunn, Inc., 408 F.2d 1108, 1115 (8 Cir. 1969); Hulsenbusch v. Davidson Rubber Company, 344 F.2d 730 (8 Cir. 1965), cert. denied, 382 U.S. 977, 86 S.Ct. 545, 15 L.Ed.2d 468 (1966). It must also be emphasized that the specific contract terms in this case were designed to protect the plaintiff from a former employee's using or divulging "any matter concerning the confidential affairs or secrets of [Gillette-England or the plaintiff] or any confidential information relating thereto . . . ." and furthermore, from a former employee within the United States working "directly or indirectly . . . in research or development work on or the manufacture of safety razors or blades."

The defendant argues somewhat inconsistently, or more charitably, in the alternative, that Williams had neither access to nor possession of any Gillette trade secrets in May, 1972, but that, even if he did, he retained none in his mind when he departed England.

The short answer to the defendant's claims is that the plaintiff has made a prima facie showing that:

1. Williams is a highly skilled scientist who for many years occupied top managerial positions with Gillette;

2. Between the years 1961 to 1968, Williams was deeply involved in Gillette's wet shave business and had knowledge of its most sensitive trade secrets and confidential information;

3. From the period of time 1968 to 1972, Williams received, read and approved reports relating to Gillette's wet shave business which, by his own admissions, were confidential and secret;

4. In addition, during those same years, Williams attended top level management meetings and conferences concerned with new developments in the wet shave field as well as in the dry shave aspects of Gillette's business; and

5. Williams was familiar with projects which may still be the subjects of pending patent applications. This, of course, is not to say that the defendant cannot effectively challenge the plaintiff's rather general showing when he presents his defense, but that remains to be done. On the present state of the record, the scales balancing the factual presentation of evidence tip slightly in favor of the plaintiff; the defendant certainly may have the opportunity to reverse the balance or bring them into equilibrium. Cf. Mixing Equipment Co. v. Philadelphia Gear, Inc., 436 F.2d 1308, 1313–1314 (3 Cir. 1971); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng. Corp., 255 F.Supp. 645, 654 (E.D.Mich.1966).

### 3. *Injunctive Relief*

■ There is little doubt that if Gillette continues to hold the evidentiary "edge" after defendant's presentation, preliminary injunctive relief is appropriate to protect Gillette's legitimate business interests. No more need be said than that Gillette would never allow Schick to gain an "inside track." It is common knowledge that these two organizations are fierce competitors in the wet shave business. The threat of disclosure is real: Williams is a Vice President of Schick's Research and Development Department and, as he freely admitted, he intends to put his entire expertise in this field at Schick's disposal. (Tr. 181).

Therefore, a few guidelines are in order. An inordinate delay before the defendant presents his evidence will offend equity in this case. Williams has little to lose by delay;[1] Gillette will suffer irreparable harm. If the defendant is not prepared to go forward with his case on April 3, 1973, or within a reasonably short period of time thereafter, the Court will entertain on April 2, 1973, an application by plaintiff for a preliminary injunction *pendente lite*.

Accordingly, the defendant's motion to dismiss the plaintiff's application for a preliminary injunction is denied.

---

1. On December 7, 1972, counsel for Gillette made an oral offer to the defendant as a "good faith gesture" if a preliminary injunction were issued. Under its proposed terms, Williams would be paid his full Schick salary of $2,750 a month until the completion of the expedited trial on the merits. Then if Gillette were to succeed at trial, the amount so paid would be credited against its obligation under the Special Agreement to pay Williams one-half his final Gillette salary for the remainder of the two year period. If a permanent injunction were denied, the sums so paid would be credited against Gillette's obligation under the preliminary injunction bond required by Rule 65(c), F.R.Civ.P.