UNIVERSAL WINDING CO. v. CLARKE et al.

Civ. A. No. 3308.

United States District Court
D. Connecticut.

July 2, 1952.

Dike & Sanborn and Robert S. Sanborn, Boston, Mass., for plaintiff.

Gumbart, Corbin, Tyler & Cooper, Morris Tyler, New Haven, Conn., Raymond E. Hackett, William H. Timbers and Morgan P. Ames, all of Stamford, Conn., Henry E. Rockwell, New Haven, Conn., of counsel, for defendant.

HINCKS, Chief Judge.

In this case the defendants moved to sever the issue raised by their second defense and for trial in advance of the issue thus severed; viz., whether, as the defendant contends, the agreement on which the complaint is based was void *ab initio* and unenforcible "as against public policy."

The motion for severance was granted and now after trial on the severed issue the defendants contend on brief that the agreement is not a binding contract because of (1) lack of consideration, (2) indefiniteness, and (3) want of mutuality. These contentions all lie outside the scope of the severed issue and I feel that I may not properly rule on them at this stage: the parties are at liberty, if so advised, and if consistent with Rule 8(c), Fed.Rules Civ. Proc. 28 U.S.C.A., to supplement the record of fact thus far made before these contentions may be deemed finally submitted and ripe for final ruling. I therefore pass these contentions now and turn directly to the task of determining the compatibility of the agreement with public policy.

The agreement purported to obligate the defendant Clarke to assign to the plaintiff any inventions or improvements that he might design during the course of his employment by the plaintiff or within one year thereafter which "related to": (1) the subject-matter of his employment; or (2) any subject matter or problem with respect to which he might become informed by reason of his employment; or (3) any article manufactured or to be manufactured by the plaintiff; or (4) any experimental work carried on by the plaintiff.

■ To determine the legal effect of this agreement, its intended scope must first be determined. What is meant by the promise to assign "improvements"? Does the phrase "inventions and improvements" include anything more than patentable inventions? Although, as defendant's counsel correctly observes on brief, the defendant could have no assignable property right in an unpatentable design, nevertheless he has a right at least to apply for a patent on any machine design evolved by him. And this inchoate right, although not a proprety right, is assignable. It is a matter of common knowledge that there is a fairly broad borderland, impossible of accurate definition, between patentable machine designs and those not patentable. Not until a patent application is prosecuted to final termination can the designer surely know whether a patent will be granted: and if a patent issues, not until it has been litigated can he surely know whether it has validity. In the light of these observations as applicable to the background of this case, it is scarcely sensible to construe the agreement to mean that the defendant-employee reserved the right to judge for himself which of his designs were patentable and the right to retain free from his covenant any actually or purportedly believed by him to be unpatentable. Instead, I interpret the agreement to mean that the defendant-employee assumed an obligation to disclose to the plaintiff all designs which he might make in the specified field within the time limited and to vest in the plaintiff all his inchoate right to apply for a patent on any machine evolved by him (within the qualifying classes enumerated) irrespective of its patentability as that should eventually be determined.

■ The next point as to which the agreement needs interpretation is the scope of the field within which the defendant-employee thus agreed to make assignments. The agreement is inherently ambiguous in that the inventions and improvements which it includes are defined not at all by the letter of the writing but only by several references to "the subject-matter of my employment" or to problems "with respect to which I have or shall become informed by reason of my employment, etc." It is thus necessary so to interpret the agreement as to give effect to the intention of the parties existing when the agreement was made. At that time the plaintiff's only activity, existing or contemplated, was in the field of winding machinery. It is, therefore, a natural inference that by the "subject-matter of my employment" the parties meant the design of winding machines and by "any article manufactured or to be manufactured" by the plaintiff they meant particular winding machines so manufactured. And so, since the parties restricted the scope of the agreement to inventions and improvements, "relating" to the "subject-matter of my employment" and other generally stated categories, I interpret the language to mean that only such inventions and improvements were intended to be included as had some peculiar pertinence or affinity to winding machines and not such, *per contra,* as had equal pertinence to other kinds of machines. This interpretation, though largely the product of inference, is not inconsistent with any underlying evidence but on the contrary is supported by some direct testimony. And, certainly, at the time neither party was shown to have had any incentive to make a contract of broader scope.

I thus reject the defendant's contention that the agreement is so broad as to ostracize him from the entire field of machine design at least for a year. This contention the defendant has sought to support by argument that if within one year while employed by an automobile manufacturer, for example, he should design a clutch suitable for use in the automobile field, it

332

would be subject to the agreement here involved if it could with equal facility or even with some adaptation be used in a winding machine. This argument is characteristic of the strategy often invoked in attacking the validity of patent claims, whereby it is sought to construe claims so broadly that findings of anticipation cannot be escaped. My interpretation of the agreement here, as stated above, avoids such a ground of criticism: I interpret the agreement more narrowly to mean that if a clutch were designed it would be free from the obligation of the agreement unless it included some feature which made it peculiarly pertinent to winding machines. Cf. Standard Plunger Elevator Co. v. Stokes, 2 Cir., 212 F. 893; Chadeloid Chemical Co. v. H. B. Chalmers Co., 2 Cir., 243 F. 606; Red Bird Farm, Inc., v. Providence Live Poultry Co., Inc., 64 R.I. 430, 12 A.2d 730.

As thus interpreted the scope of the agreement is vastly more limited than the defendant represents. See, particularly finding 20. Also it will be observed that the language of the agreement and the nature of the obligation directly imposed is wholly affirmative, viz.; to assign and disclose. Thus on the surface it is no more restrictive in nature than any contract to render services on a part-time basis.

Nevertheless, and notwithstanding the absence of any express negative covenant in the agreement, if we are realistic we must recognize that it has this practical restrictive effect, viz.; no competitor of the plaintiff in the field of winding machines would want to employ a designer who for the first year was under obligation to disclose the fruit of his labor to the plaintiff and in effect give the plaintiff a first option on any patentable rights. Naturally an employer taking on an additional designer would want to engage one whose inventive skill would not redound even in part to his former employer. Thus in this aspect the agreement savored of a covenant for the year following employment by the plaintiff not to work, or not to accept employment, for one year in the field of the design of winding machines.

Turning then from the interpretation of the contract to consideration of its legal effect, I note first that the agreement was executed in Rhode Island and that the plaintiff's plant was located in Cranston, R. I. It is reasonable to infer that the parties intended that the agreement should be performed there. Hence this court, with its seat in Connecticut, will apply Rhode Island law in determining the validity and effect of the contract. Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Levy v. Daniels U-Drive Auto Renting Co., Inc., 1928, 108 Conn. 333, 143 A. 163, 61 A.L.R. 846; Cf. Illustrated Postal Card & Novelty Co. v. Holt, 1912, 85 Conn. 140, 81 A. 1061.

The only Rhode Island case touching on the question of the validity and effect of an agreement by an employee to assign his inventions and improvements to his employer is Silver Spring Bleaching & Dyeing Co. v. Woolworth, 1890, 16 R.I. 729, 19 A. 528. In that case the Rhode Island court ordered an assignment of certain inventions and discoveries. The court's opinion, however, appears to offer no aid here beyond the demonstration that such agreements are not necessarily in conflict with the public policy of Rhode Island.

However, the Rhode Island courts have decided the reasonableness of covenants by employees not to compete with their employers on at least three occasion. Koppers Products Co. v. Readio, 1938, 60 R.I. 207, 197 A. 441; Tillinghast v. Boothby, 1897, 20 R.I. 59, 37 A. 344; Herreshoff v. Boutineau, 1890, 17 R.I. 3, 19 A. 712, 8 L.R.A. 469. These cases hold that such contracts are not void *per se*, but that they may be held to be void if they are unreasonably in restraint of trade. Herreshoff v. Boutineau, supra. In determining their reasonableness, an attempt should be made to weigh the competing interests of employer and employee and to give full consideration to the public interest. In terms of these interests, a covenant will be void *ab initio* if it "extends beyond any apparently necessary protection which the complainant might reasonably require, and thus, without benefiting him, it oppresses the respondent, and deprives people in other places of the chance which might be offered them" to avail themselves of his

services. Herreshoff v. Boutineau, 17 R.I. 3, 7–8, 19 A. 712, 713. A similar standard has been applied in cases construing the reasonableness of covenants by vendors of businesses not to compete with their vendees. North Shore Dye House, Inc., v. Rosenfield, 1933, 53 R.I. 279, 166 A. 346 and French v. Parker, 1888, 16 R.I. 219, 14 A. 870; Cf. Oakdale Manuf'g Co. v. Garst, 1894, 18 R.I. 484, 28 A. 973, 23 L.R.A. 639. I conclude that a Rhode Island court would apply the same test here.

What then were the plaintiff's needs for the protection of its competitive position?

Especially in view of the facts stated in findings 17–25, it was necessary for the proper protection of plaintiff's competitive position that a current knowledge of the plaintiff's great fund of specialized information and accumulated experience in the field of winding machinery should be made unavailable for the development of designs inuring to the benefit of plaintiff's competitors. As remarked above, the affirmative obligation to assign imposed on an employee by the agreement here involved had a natural tendency to obstruct the employment of the employee by a competitor during the year's life of that obligation. It thus in a very practical way made it materially less likely that the secrecy needed for the plaintiff's proper protection would be breached. In a real sense this affirmative obligation might be expected to be more effective in preventing harmful disclosures than an express negative covenant not to disclose. That is so because for the breach of a negative covenant only the employee would be liable and his new employer would lose nothing. But from the affirmative agreement to assign designs made within a year it well might result that the new employer would lose exclusive control of a design which, even if developed from plaintiff's accumulative experience, was completed on time and with facilities furnished by the new employer.

As I have interpreted the agreement the only field restricted was the well defined field of winding machinery. And this field had been widely pervaded by plaintiff's actual manufacturing activities. Thus the subject-matter of restriction did not exceed that reasonably needed for plaintiff's protection.

Also reasonably required for plaintiff's protection was the extension of the agreement to the period of the year succeeding the employment. For that limited period at least it was reasonable for the plaintiff to view askance the employment by competitors of its recently employed research personnel who had had free access to its great fund of accumulated experience and who had current knowledge of its designs which still were in an embryonic state. To exploit these designs to its advantage, it was obviously necessary for the plaintiff to put them into actual production, to test them, and build up a market for them before imitative competitors could begin that process of development. For a task which thus involved the translation of a design in the blue-print stage to an operable, tested machine in the hands of customers, it is reasonable to infer that generally the plaintiff for its competitive needs would require at least a year's time. See particularly finding No. 17.

Nor was the restriction unreasonable for its impact on the employee. Under my interpretation, the field of design from which the employee was excluded was a field (a) in which he had had no experience prior to this employment and (b) which was but an insignificant fraction of the entire field of machine design. Even if the practical effect of the agreement was to exclude the defendant from employment by a competitor of the plaintiff the restriction was to last but a year and was not out of balance with the advantage which the employee derived from the opportunity throughout his employment to absorb the accumulated experience of the employer and add to his own capacity as a designer in this specialized field by observation of the skills of all his fellow research employees. Chadeloid Chemical Co. v. H. B. Chalmers Co., 2 Cir., 243 F. 606. Defendant's counsel have argued that the over-all arrangement was unreasonable because it was such as to permit the plaintiff to discharge an employee subject to the agreement in question after a short period of employment thus leaving him practically ineligible as a designer in

the field of winding machines for a full year. But this, I think, is a phantom objection without real substance. There is no evidence that the plaintiff ever intended or used the agreement for purposes of malice, and there is no basis for inferring that it ever would be so used: if such a case should arise, certainly equity would not lend a helping hand. If, on the other hand, the plaintiff should ever, in good faith, discharge an employee after only a short period of employment, its action would generally be attributable to the incompetence of the employee. And a designer thus found to be incompetent in the winding machine field would be little hurt by the obligations inherent in this agreement.

Nor is there any showing here that the agreement was unreasonably restrictive for its impact on the public. So far as appears, any design made by the defendant subsequent to his employment by the plaintiff would redound as much to the benefit of the public if assigned to the plaintiff as it would if retained by the defendant or assigned to another. Nor to the extent that the agreement tends to obstruct for a year the defendant's employment by a plaintiff's competitor, is its effect shown to work any public harm: any obstruction to defendant's employment in the field of winding machinery would naturally direct his talents into other areas also possibly within the field of machine design where, so far as appears, they would be equally useful to the public.

Instead of evidence of public harm the record shows that the plaintiff has gone to progressively increasing expense for research of which the public was the ultimate beneficiary. There is no evidence that these benefits would long be preserved to the public if the plaintiff's competitive position is not afforded reasonable protection. In the long run, the public is better served by giving a year's head-start in the competitive race to a manufacturer who has ventured his capital and skill in research and in the practical application of the accumulation of his knowledge and experience in that field, than by leaving such a one to start the race at scratch with a com-

petitor having no such stake in the business.

█ Thus I reach the conclusion that the agreement involved was valid and enforcible and that the second defense should be overruled. The conclusion, it may be noted, is supported by the only reported Connecticut decision in which the particular question here in issue was decided. Murray v. A. F. Holden Co., Super.Ct., N. H.County, 1944, 12 Conn.Supp. 419. And the decisions of the Court of Appeals for this circuit as to the reasonableness of agreements to assign inventions and improvements, if controlling here, would apparently require a similar result. Chadeloid Chemical Co. v. H. B. Chalmers Co., supra; and Standard Plunger Elevator Co. v. Stokes, supra. See also New Jersey Zinc Co. v. Singmaster, 2 Cir., 1934, 71 F. 2d 277; Conway v. White, 2 Cir., 1923, 292 F. 837 and 2 Cir., 1925, 9 F.2d 863, and Hydraulic Press Mfg. Co. v. Lake Erie Engineering Corp., 2 Cir., 1942, 132 F.2d 403.

### Findings of Fact

1. The plaintiff is a citizen of Massachusetts whose manufacturing facilities are located in Rhode Island. The defendants are citizens of Connecticut. The amount in controversy exceeds $3,000.

2. On April 1, 1947, in connection with the expansion of plaintiff's manufacturing program, plaintiff ran, in the Boston Herald, an advertisement for research and development machine designers and project engineers.

3. The defendant William W. Clarke (hereinafter called "defendant") wrote to the plaintiff answering said advertisement and, after an exchange of correspondence, on April 9, 1947 visited the plaintiff's plant in Cranston, R. I. He was there interviewed by Mr. Bell, the plaintiff's director of research, and Mr. Goodhue, Bell's assistant. Mr. Bell did not at that time discuss with defendant the subject of an agreement to assign inventions and designs to plaintiff. The defendant was interested in the possibility of employment by the plaintiff because he wanted to work in New England and wanted to "get back to work at machine design."

4. On April 11, 1947, Mr. Bell sent defendant a telegram offering him a position with the plaintiff. On April 14, 1947, defendant sent plaintiff an answering telegram accepting the offer, and that same day Mr. Bell wrote a letter to the plaintiff confirming the arrangement.

5. The defendant was hired by the plaintiff to work as a machine designer in its research and development department at an annual salary of $4,500. The employment was without fixed term.

6. The defendant reported for work in Cranston on April 21, 1947. He was then assigned a drawing board and was processed by the plaintiff's personnel department. During the course of the morning and before the defendant had actually started work, at the request of Mr. Morell, the plaintiff's assistant personnel manager, the defendant signed the following agreement which had been drafted by the plaintiff and which was presented for his signature on a mimeographed form:

"Agreement for Assignment
of
Inventions and Designs

"In consideration of One Dollar ($1.00) and other valuable considerations to me paid by Universal Winding Company, receipt whereof is hereby acknowledged, and in further consideration of my employment by said Company, I hereby agree that all inventions and improvements heretofore or hereafter made or invented by me at any time during my employment by the Company or within one year from the termination of such employment and relating to the subject matter of my employment or to any subject matter or problem with respect to which I have or shall become informed by reason of my said employment or to any article manufactured or to be manufactured by the Company or to any experimental work carried on by the Company, shall be the sole and exclusive property of the company. I further agree to execute without compensation but at the Company's expense all documents which the Company may deem necessary or desirable to secure to it the benefit of any invention or improvement to which it may be entitled as aforesaid, including, without limiting the generality of the foregoing, any application for letters patent with respect thereto and any instruments of assignment of such inventions or improvements or of any letters patent with respect thereto, or of any applications therefor. The foregoing agreement shall be construed to include all my right and interest in any such designs or improvements made in part by me.

"In Witness Whereof I have hereunto set my hand this 21 day of April, April 21, 1947.

"William W. Clarke
"Witness:
　　T. L. Morell
　　W. V. Clarke."

7. The defendant made some protests concerning the "one year thereafter" clause in the agreement to Mr. Morell.

8. Notwithstanding, the defendant signed the form at that time without the receipt of any consideration other than that inherent in his contract of hiring.

9. At the time the defendant was about 32 years of age, married and with a family.

10. Defendant's formal education did not extend beyond the high school level, although he has taken various college extension and other courses and has done home study in machine drawing, slide rule, machine design, strength of materials, and geometry.

11. Defendant was by profession an industrial designer. From 1933 to 1947 he designed or aided in the design of many different machines and types of machines for a number of different employers engaged in many different lines of manufacture. In consequence, many of the components in many types of machinery, including certain components in winding machinery, were known to him when he entered the plaintiff's employ. He had prior to 1947 derived practically his entire livelihood from design ability and work. However, during a considerable period immediately prior to April, 1947 his principal professional activity had been that of design outside the field of machine design.

12. Prior to April, 1947 defendant had had no experience whatsoever in the design of winding machines, either textile or coil (wire) winders.

13. The plaintiff has been in the business of manufacturing winding machinery since 1893. It had 2,200 employees in 1947. Winding machinery includes both textile winding machinery and coil winders. The great bulk of plaintiff's business is in textile winding machinery and the components thereof. In its fiscal year of 1947 the plaintiff had gross sales of $9,800,000.

14. In 1947 approximately 6% of the plaintiff's sales consisted of sales of electrical coil winding machines. Coil winding machines are used in the manufacture of coils of electrical magnet wire, and are very similar to textile winding machines, the elements being practically identical.

15. The plaintiff manufactures a fairly complete range of winding machines. It does not, however, manufacture a complete line of coil winding machines, i. e., there are quite a number of coils in common use in this country for which it builds no machinery.

16. The plaintiff itself manufactures most of the components which go into its machinery, except standard items like electrical motors, ball bearings and leather belting. From its commencement in 1893 until May 31, 1950, when the defendant left the plaintiff's employ, and for one year thereafter, the plaintiff's business was confined to the manufacture of winding machines except for a period during the Second World War when it made rifles.

17. During the fiscal year 1947 the plaintiff expended approximately $300,000 for research, development and engineering. The plaintiff has spent as long as ten years and as much as $600,000 on the development of a single machine.

18. In the period in and around April, 1947 the plaintiff considerably expanded its research department because it felt that the future success of its business was dependent on developing improved machines. As of April 1, 1947 the plaintiff had 79 employees in its research and development department.

19. The plaintiff's business is highly competitive. As of 1947, of the types of coil winders made by plaintiff about 35% of the gross sales in this country were made by plaintiff: of the total sales of coil winders (of all types) about 10% were made by plaintiff. These figures do not purport to reflect a true comparison of the plaintiff's production of coil winders and the total production thereof in this country, however, since the source of coil winders, and the market therefor, is international in character and many users of coil winders manufacture their own.

20. The plaintiff's production, which as above stated is confined to winding machinery, comprises only a minute part of the total production of machinery in this country. The plaintiff's business is a highly specialized business in a comparatively narrow field.

21. The textile machinery business is an old art and one in which current patentable inventions are rare. Seldom has such machinery complete patent protection, and many of the component parts of plaintiff's machinery are not covered by patents. The plaintiff's coil winding machine business grew out of its textile winding machine business and is subject to similar difficulties in obtaining patent protection.

22. During the years it has been in business, the plaintiff and its employees have amassed considerable experience in and information about the winding machine business. Because of long-established good relations with its customers, the plaintiff is in an unusually good position to ascertain the nature of the market for winding machines. Its research employees make frequent visits to customers' plants and it often installs experimental machines in customers' plants for testing. During their visits to customers' plants, the plaintiff's employees sometimes have an opportunity to examine competitors' machines.

23. Because of its inability to obtain full patent protection for its machines, the plaintiff feels that it is essential for it to take all possible measures to protect its fund of experience and information from disclosure to competitors.

24. This fund of experience and information is generally available to all of the plaintiff's research employees: without such access their services would be less effective. However, the plaintiff uses every reasonable means to keep this fund of information and experience confidential.

25. It would be exceedingly difficult for a manufacturer to succeed in the winding machine industry without a fund of information and practical experience such as that possessed by the plaintiff.

26. One of the means used by the plaintiff in keeping its experience and information secret is the form of agreement which the defendant signed. (See Finding #6) The plaintiff first adopted the use of such an agreement in 1936. At that time, the form of agreement used applied only to the period of the employee's employment with the plaintiff. In 1939 the agreement was changed to its present form.

27. As of April 1, 1947 all of the plaintiff's research employees were subject to such an agreement. Thirty-eight of them had executed the form of agreement which was signed by Clarke. The other forty-one were under the 1936 form of agreement.

28. In 1947, it was fairly general practice for other machinery manufacturers to obtain from their employees agreements generally similar in form to that which the defendant signed.

29. There is no evidence that any of the plaintiff's employees had, prior to 1947, in any way revealed specific information concerning the subject-matter of their employment by the plaintiff to any of the plaintiff's competitors, although generally; because the plaintiff's business is highly competitive, the secrecy of its business details is not long maintained. At one time a recently-resigned research employee offered to sell an invention or improvement to the plaintiff, which invention or improvement the plaintiff believed had been developed while that employee was in its employ.

30. The assignment agreement entered into by the plaintiff and defendant had the effect of reducing the defendant's chances of obtaining employment in the winding machine industry during the first year after he left the plaintiff's employ.

31. The plaintiff's general information and experience concerning winding machines, as well as its development program, are valuable assets of its business which it is entitled, by use of all reasonable means, to keep secret from its competitors or potential competitors.

32. The winding machine industry is a reasonably well-defined department of the textile industry and a reasonably well-defined segment of the machine industry.

33. The assignment agreement was intended by the plaintiff and the defendant to apply only to inventions or improvements having peculiar affinity to winding machines, but to include designs both patentable and unpatentable.

34. In the present action the plaintiff asks protection only as to the defendant's activities in designing a coil winding machine for one if its competitors.

Conclusions of Law

1. This court has jurisdiction of the parties and subject-matter.

2. The law of Rhode Island is applicable here.

3. Under the law of Rhode Island a contract by an employer prohibiting an employee from accepting employment with a competitor is not invalid as an unreasonable restraint of trade if the extent of the restraint reasonably to be expected therefrom is (a) no greater than reasonably required to protect the employer's competitive position, (b) is not such as unreasonably to curtail the employee's freedom of contract and (c) is not such as to impair the public interest.

4. The written agreement of April 21, 1947 should be interpreted to apply only to inventions and improvements in the field of winding machinery but to include all designs, patentable or unpatentable, in that limited field.

5. Said written agreement was not invalid or unenforcible as an unreasonable restraint on trade.

6. The defendants' second defense to the complaint herein should be overruled.

It is ordered accordingly.