210 N.J. Super. 339 (1986)
509 A.2d 821
INGERSOLL-RAND COMPANY, A NEW JERSEY CORPORATION, AND INGERSOLL-RAND RESEARCH, INC., A DELAWARE CORPORATION, PLAINTIFFS,
v.
ARMAND CIAVATTA, A RESIDENT OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division Somerset County.
Decided February 20, 1986.
*341 Mark S. Anderson for plaintiffs (Woolson, Guterl, Sutphen and Anderson, attorneys; James M. Rhodes, Jr., of the New York Bar and Hopgood, Calimafde, Kalil, Blaustein & Judlowe of counsel).
Charles J. Walsh for defendant (Sills, Beck, Cummis, Zuckerman, Radin & Tischman, attorneys).
D'ANNUNZIO, J.S.C.
Defendant is a former employee of plaintiff.[1] During his employment he signed a document pursuant to which he agreed to assign to Ingersoll-Rand (hereinafter sometimes referred to as I-R) any devices invented or conceived by him under certain circumstances and during certain specified time periods. The major issues in this case are: (1) whether, under the terms of the agreement, defendant is required to assign to plaintiff a friction stabilizer which defendant invented; (2) if plaintiff is entitled to the invention under its agreement with defendant, whether the agreement is enforceable under the facts and circumstances of this case.

The Device.
One of the dangers of underground mining is the potential collapse of the mine's rock roof. Various methods and devices have been utilized to stabilize mine roofs. One of the devices is *342 manufactured by I-R under an agreement with its inventor, Dr. James Scott. Plaintiff's device is a steel tube fabricated and sold in lengths of four feet and five feet. Its diameter is approximately one and one-half inches. The tube is split longitudinally for its entire length. In effect, the circle which forms the cylinder is not closed, therefore, looking at the end of the tube, an observer does not see the letter O, he sees the letter C.
Plaintiff's device is called a friction stabilizer. To stabilize a roof using plaintiff's device the mine operator drills a hole in the roof. The drill hole is a few inches deeper than the stabilizer is long, but the diameter of the hole is smaller than the diameter of the friction stabilizer. The stabilizer is driven into the hole for its entire length. The differential between the hole diameter and the diameter of the stabilizer causes the stabilizer to deform similar to the deformation (compression) of a spring under pressure. When it has been driven completely into the hole the force required to deform it provides a friction grip which tends to prevent the rock strata from separating. In effect, the tube frictionally engages the rock. Apparently the stabilizers are installed in a pattern in the mine roof. The distances between the stabilizers and the characteristics of the pattern are neither known to the court nor important to this litigation.
Dr. James Scott conceived the idea for the stabilizer. Working with Dr. Scott plaintiff began a development program in 1973. The first patent issued to Dr. Scott in December 1975, and was assigned to I-R. Plaintiff began marketing the device in February 1977 under an agreement with Dr. Scott. From 1973 through 1976 plaintiff expended $518,379 on its development program. An additional $844,306 was expended for research and development in 1977 and 1978. These amounts include an allocation of research and development overhead, and the 1977 and 1978 amounts include efforts to develop tooling related to the stabilizer, e.g., drilling equipment.
*343 The stabilizer has been a successful product. Millions of units have been sold. Sales targets for the years 1983 through 1987 average 3 million units a year at approximately $3 a unit. Friction stabilizers compete with other methods of roof stabilization such as mechanical anchor bolts and resin grouted bolts. Currently friction stabilizers are not purchased for use in coal mines because existing drilling equipment in coal mines cannot be used to install friction stabilizers.

Armand Ciavatta.
Defendant is a middle-aged engineer who has had a varied employment history. In 1972 he was employed by an I-R subsidiary, the Miller's Falls Tool Company. He was terminated in 1974, but sought employment with other units of I-R. In October 1974 he was hired by Ingersoll-Rand Research. His title was program manager. As a condition of his employment, defendant was required to execute the agreement in question titled agreement relating to proprietary matter. From 1974 to March 1978 defendant clearly was involved in a research capacity, although he was not formally involved in or assigned to research or development relevant to the friction stabilizer.
However, Dr. McGahan, the Director of Research, encouraged the research staff to be creative, to discuss ideas for projects or potential projects beyond those to which they had been assigned. These ideas were to be submitted on disclosure forms. Defendant submitted 13 disclosures through 1975. Five of his proposals were for devices to support or stabilize mine roofs. Although four of them were not friction stabilizers, the disclosure dated September 30, 1975 specifically used the phrase, split set, which is the registered trade name of plaintiff's friction stabilizer. In his disclosure defendant stated: "A potential useful feature to [sic] the I.R. split set roof bolting technique is that it is hollow. Once installed its holding characteristics can be improved by the following." Defendant then suggested the use of a resin mix or grouting material to be forced into the tube to surround the split set.
*344 In March 1978 defendant was named manager of manufacturing of the friction stabilizer. I-R does not fabricate the stabilizer in any of its plants. Rather it contracts with others to manufacture the product in conformity with I-R's specifications. As manager of manufacturing it was defendant's responsibility to administer the manufacturing program. It was his job to see that the stabilizers were produced in the required quantity and to the required quality. Defendant was I-R's liaison with the fabricators and worked with them in all relevant areas including manufacturing process, product specification, material and quality testing and assurance.
On June 22, 1979 I-R terminated defendant's employment because of a conflict between defendant and his superior, John Irwin. After his termination defendant sought employment with other I-R divisions but none was offered. In February 1980 he became employed by Architectural Research, a firm which manufactured panels for building exteriors, in a position which lasted until July 1980.
Shortly after termination by plaintiff, he conceived an idea for a friction stabilizer with a configuration different from plaintiff's stabilizer. Defendant's device differed from plaintiff's device in two respects: (1) it's circumference was closed rather than split; (2) it's shape was elliptical not round.
Defendant admits to conceiving the invention in August 1979 less than two months after I-R terminated his employment. A patent application was filed on his behalf in March 1980, nine months after termination. An additional patent application was filed in March 1981 and U.S. patents were issued to defendant on February 23, 1982 and March 30, 1982. Patents from other countries were also issued to defendant. The market place has begun to accept defendant's product and his device appears to be a competitive threat to plaintiff's device. I find as a fact that defendant's device sells at a lower price than plaintiff's device. Other than the price advantage, there is inadequate evidence from which the court could draw conclusions as to the *345 relative effectiveness of the competing devices. That is, the court does not know whether defendant's device is as effective, more effective or less effective than plaintiff's device or whether the only advantage to defendant's device is its price.

The Agreement.
The agreement, executed on October 1, 1974, establishes three sets of circumstances which require an employee, or former employee, to assign an invention to I-R:
... I have agreed as follows:
1. To assign, and I hereby do assign, to the COMPANY, its successors and assigns, my entire right, title and interest in and to all inventions, copyrights and/or designs I have made or may hereafter make, conceive, develop or perfect, either solely or jointly with others either,
(a) during the period of such employment, if such inventions, copyrights and/or designs are related, directly or indirectly, to the business of, or to the research or development work of the COMPANY or its affiliates, or
(b) with the use of the time, materials or facilities of the COMPANY or any of its affiliates, or
(c) within one year after termination of such employment if conceived as a result of and is attributable to work done during such employment and relates to a method substance, machine, article of manufacture or improvements therein within the scope of the business of the COMPANY or any of its affiliates;
The evidence does not support application of 1(a) or 1(b) to Ciavatta. The evidence is clear, however, and the court so finds, that circumstance number three applies. Defendant invented his stabilizer in August 1979 and developed it to such an extent that he applied for a U.S. patent in March 1980. There is no doubt that defendant's product relates to an article of manufacture within the scope of plaintiff's business.
The court also finds that Ciavatta conceived his invention as a result of work done during his employment and that it is attributable to that work. Ciavatta admitted that he had no experience with mining machinery before he joined I-R in 1974 and had no prior interest in the subject. In the summer of 1974 Dr. McGahan assigned him to investigate methods of coal haulage. To fulfill this assignment he did extensive library research which stimulated an interest in underground mining. *346 That interest generated a period of creativity in 1975 reflected in the disclosures filed with I-R. Many of these disclosures were of mining related ideas and at least five of them involved roof bolt systems, including a proposal to improve the holding characteristics of the split set.
Ciavatta's involvement with I-R's friction stabilizers became direct in March 1978 when he was named manufacturing manager of that product. In that capacity defendant had to develop in-depth knowledge about the product, its design, specifications, materials, fabrication, function, costs, pricing and problems as well as customer requirements and criticisms. An isolated example of his deep involvement with the product was his contribution to the solution of the so-called banana peeling problem. Stabilizers manufactured by one of plaintiff's two fabricators had a tendency to split and peel back upon being driven into the drilled hole in the mine roof. Defendant identified the cause of the problem and its solution.
Plaintiff's friction stabilizer was defendant's professional life from March 1978 to June 22, 1979. Defendant testified that within four to five weeks of his termination he conceived the idea which resulted in his patent applications.
The court is satisfied that the terms of the agreement require defendant to assign his invention to the plaintiff.
Defendant argues that, even if the facts trigger the contractual obligation to assign the invention, contracts requiring a former employee to assign inventions made after termination of the employment are enforced only to a limited extent, that is, only where defendant has appropriated trade secrets or confidential information of the former employer. Defendant also argues that such contracts are against public policy because their only purpose and effect is to stifle competition. Defendant also urges the defenses of estoppel, laches and unclean hands.
In the absence of a contract, an invention conceived and made by an employee during his employment belongs to *347 the employer only if the employee had been employed to invent. If the employee was not engaged to invent on behalf of the employer but the invention was conceived by the employee during working hours with the use of the employer's machinery and materials, the employer has an irrevocable but non-exclusive right to use the invention. The invention, however, belongs to the employee. This is the so called shop right rule. Kinkade v. N.Y. Ship Building Corp., 21 N.J. 362 (1956). Contracts requiring an employee to assign to the employer inventions made or conceived by the employee during the employment are enforceable. Misani v. Ortho Pharmaceutical Corp., 44 N.J. 552 (1965), app. dism. 382 U.S. 203, 86 S.Ct. 398, 15 L.Ed.2d 270 (1965) and the cases cited therein. However, the court has found no New Jersey case involving a holdover clause, i.e., one which requires assignment of inventions conceived within a period of time after termination of employment and counsel have referred the court to none.
Instead, defendant relies upon New Jersey decisions dealing with enforceability of covenants in employment contracts which preclude employees from competing with or accepting employment with persons who compete with the former employer. Thus, defendant cites Solari Industries, Inc. v. Malady, 55 N.J. 571 (1970) and Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25 (1971). They hold that restrictive employment covenants are enforceable to the extent that they are reasonable and they are reasonable only to the extent that they protect a legitimate interest of the employer. Those courts recognized as legitimate the employers' interests in protecting trade secrets, confidential information and customer relationships.
To further support his argument defendant relies upon several decisions of the federal courts. Winston Research Corp. v. Minnesota Mining and Mfg. Co., 350 F.2d 134 (9 Cir.1965) is cited by defendant and is heavily relied upon in other federal decisions cited by defendant. In the context of this case that reliance is misplaced. The employment contract in Winston by *348 its terms applied only to post-employment inventions based upon the confidential information of the former employer.
However, Armorlite Lens Co. v. Campbell, 340 F. Supp. 273 (S.D.Cal. 1972) clearly supports defendant's position. The employment agreement contained a one-year holdover clause requiring assignment of new ideas or concepts. The employee's undertaking was not limited to new ideas based upon or utilizing the employer's trade secrets or confidential information. On defendant's motion for summary judgment the trial court held that to require an assignment in circumstances in which the new idea was not based upon the employer's trade secrets or confidential information would constitute an unreasonable restraint of trade. The court further held, citing Winston, that the agreement could be enforceable to the extent that secrets or confidential information were utilized. Summary judgment was denied because of factual issues regarding the use of secrets and the dates the ideas were conceived.
In GTI Corp. v. Calhoon, 309 F. Supp. 762 (S.D.Ohio 1969) the employment agreement required Calhoun to assign to plaintiff any ideas or improvements conceived by him within five years of termination of his employment if they related to plaintiff's products. The court held that it was unenforceable because it unreasonably restricted Calhoun's right to utilize his general skill and knowledge in subsequent employment. This decision does not appear to require use of employer's secrets to support enforcement of a holdover clause. Rather, the decision appears to result from a balancing of the legitimate interests of employer and employee against the background of the facts underlying the dispute. One of the circumstances stressed by repetition in the opinion was that the defendants' expertise had been developed before their employment by plaintiff.
... defendants brought to plaintiff their know-how in this field acquired during their previous employment and enabled plaintiff to renovate its machines so that plaintiff could compete with General Electric and Sylvania.... [Id. at 770]
The court also noted that "plaintiff hired ... Calhoun in order to obtain his expertise, skill and experience acquired at *349 Sylvania so that plaintiff could copy the Sylvania weld machines." Id. at 773.
The G T I decision rejecting enforcement of the holdover clause is more the product of application of a rule of reasonableness rather than a trade secret litmus test.
New Jersey Zinc Co. v. Singmaster, 71 F.2d 277 (2 Cir.1934), cert. den. 293 U.S. 591, 55 S.Ct. 106, 79 L.Ed. 685 (1934) held that an employee upon leaving employment is not prohibited from making improvements upon basic patents belonging to the former employer. "Exercise of talents resulting in invention after termination of employer-employee relationship entitles the employee to a grant of a patent and patent protection." Id., 71 F.2d at 280. The decision is not persuasive precedent because the employment agreement which required assignment of inventions conceived during employment contained no such requirement as to post employment inventions.
In contrast with defendant's argument is Universal Winding Co. v. Clarke, 108 F. Supp. 329 (D.Conn. 1952). Defendant was employed by plaintiff as a machine designer in its research and development department. He executed an agreement to assign inventions; it contained a one-year holdover clause. Plaintiff manufactured winding machinery primarily for the textile industry. The issue addressed by the court was whether the agreement was void and unenforceable as against public policy.
Initially the court limited the agreement's impact by construing it to apply only to inventions and improvements pertinent to winding machines. The court also recognized that because defendant was employed as a designer whose employment history was in the field of machinery design the practical effect of the agreement was to prevent defendant's employment by others in the field of the design of winding machines.
Borrowing from Rhode Island decisions enforcing covenants not to compete the court held that the agreement before it would not be void if it did not extend beyond any necessary *350 protection required by the employer. The court defined plaintiff's interest as follows:
... it was necessary for the proper protection of plaintiff's competitive position that a current knowledge of the plaintiff's great fund of specialized information and accumulated experience in the field of winding machinery should be made unavailable for the development of designs inuring to the benefit of plaintiff's competitors. [Id., 108 F. Supp. at 333].
After concluding that the subject of the restriction did not exceed plaintiff's reasonable requirement for protection and that the one-year holdover period was reasonable, the court considered the impact on the defendant-employee.
... Under my interpretation, the field of design from which the employee was excluded was a field (a) in which he had had no experience prior to this employment and (b) which was but an insignificant fraction of the entire field of machine design. [Ibid.]
The court found the agreement to be enforceable and concluded:
In the long run, the public is better served by giving a year's head start in the competitive race to a manufacturer who has ventured his capital and skill in research and in the practical application of the accumulation of his knowledge and experience in that field, than by leaving such a one to start the race at scratch with a competitor having no such stake in the business. [Id. at 334].
Reasonableness was the test applied in Guth v. Minnesota Mining & Mfg., Co., 72 F.2d 385 (7 Cir.1934), cert. den. 294 U.S. 711, 55 S.Ct. 506, 79 L.Ed. 1245 (1935) to partially enforce an assignment agreement. The agreement contained no time limit and by its terms was applicable to any inventions made by defendant, a research chemist. The court held that the contract as written was so broad that it was void as against public policy. However, specific performance was granted to require assignment of an invention made during employment and a second invention made after employment but which was an improvement on the first.
In Dorr-Oliver, Inc. v. United States, 432 F.2d 447, 193 Ct.Cl. 187 (1970) the court refused to apply a one-year holdover clause to an invention of an improved trailer for transporting palletized cargo. The court's refusal to enforce was based on the finding that defendant's employment had not been in the *351 field of cargo trailers and the evidence did not show that he had knowledge of his employer's activities relating to cargo trailers.
The court articulated the principles it applied:
Hold-over clauses in employment contracts are enforceable only if they constitute a reasonable and justifiable restriction on the right of employees to work in their profession for subsequent employers. (citation omitted) Their legitimate purpose is to prevent an employee from appropriating to his own use or to the use of a subsequent employer inventions relating to and stemming from work done for a previous employer. Hold-over clauses are simply a recognition of the fact of business life that employees sometimes carry with them to new employers inventions or ideas so related to work done for a former employer that in equity and good conscience the fruits of that work should belong to the former employer. In construing and applying hold-over clauses, the courts have held that they must be limited to reasonable times ... and to subject matter which an employee worked on or had knowledge of during his employment. [Id. at 452, 193 Ct.Cl. 187].
The Solari-Whitmyer principles, which require the existence of trade secrets or confidential information as a prerequisite to enforcement of a restrictive covenant, are not applicable to the agreement in issue. Those principles were established to protect the right of an employee to change employment and to use his skill, knowledge and experience to further his employment prospects in the job market. Those principles were also established to promote the public interest in the most effective and widespread use of an employee's skills and experience. If enforced without limitation, restrictive employment covenants would have a direct effect on an employee's ability to change employment and would have a direct effect on the ability of other prospective employers to utilize his skills and experience. Solari-Whitmyer require an employer to demonstrate need or interest sufficient to justify the direct impact on an employer's right to change employment. An agreement to assign inventions containing a one-year holdover clause would not necessarily have a direct impact on an employee's ability to seek and accept other employment. The court does recognize that a holdover clause may exert a substantial indirect restraint against employment by others under certain circumstances, e.g., where an employee was involved in research and product development with an extensive employment history in a particular *352 limited field. The potential for a substantial indirect deterrent to alternative employment in an individual case should not preclude enforcement of all holdover assignment agreements despite the inability of an employer to prove that a trade secret or confidential information has been pirated and utilized.
In many cases, employer secrets or confidential information relevant to the new invention may exist but evidence sufficient to ground an inference that privileged information was discovered by the former employee or utilized by him may be very difficult to develop. In the case at bar, plaintiff contends that certain drawings of alternative configurations of a friction stabilizer were developed by Dr. Scott and Dr. McGahan during defendant's employment. These drawings are P-13 and P-14 in evidence. They include elliptical shapes similar to the elliptical shape of defendant's stabilizer. The drawings were kept by Dr. MaGahan in an unlocked file cabinet in a hallway near his office and were accessable to I-R employees, including defendant. Plaintiff urges the court to find that defendant utilized these drawings in conceiving his invention. Although the court finds that the drawings constituted information that was confidential within the I-R family, the direct evidence is insufficient to support a finding of piracy by defendant or that defendant was aware of them or had seen them. Despite defendant's conception of his idea almost immediately after his termination and the policy of encouraging free discussion of ideas and concepts promoted by Dr. McGahan, the circumstantial evidence is also inadequate to support a finding of piracy.
Furthermore, P-13 and P-14 do not contain information of significance. Each document contains simple drawings of various shapes. There is nothing proprietary about an ellipse. It is also clear that Dr. Scott was very open and communicative about his ideas. Defendant's exhibits include publications and numerous references thereto authored by Dr. Scott commencing in 1973. In these publications he freely discussed the friction stabilizer and its principles of operation.
*353 There is nothing arcane about those principles. Plaintiff's manufacturing process has been in existence for over 50 years. Anyone can buy plaintiff's product, observe it, measure it and analyze its steel content. In short, there does not appear to be anything secret about it or the principles it utilizes.
Defendant's argument that trade secret piracy is a prerequisite to enforcement of the agreement overlooks part of the rationale of enforcement so well expressed in the extract from the Dorr-Oliver, Inc. opinion quoted above. In some circumstances in equity and good conscience the fruits of the work of a former employee should belong to the former employer. That rationale appears to be posited in part on recognition of the sometime unstructured, informal and serendipitous processes that lead to invention. Processes that receive their impetus and inspiration from exposure to a subject and interaction with one's colleagues, co-employees and superiors. A process in which neither secrets nor confidential information plays a part.[2]
For these reasons, the court rejects defendant's argument that the holdover clause is unenforceable in the absence of a finding that the invention was based upon secrets or confidential information pirated from plaintiff.[3]
The holdover clause will be enforced if it is fair, reasonable and justifiable in light of the facts and circumstances of this case and upon consideration of the following factors:
(a) The invention is related to and a direct result of defendant's employment with the plaintiff, particularly his employment as manager of manufacturing of plaintiff's friction stabilizer from March 1978 through June 1979.
(b) Defendant's knowledge of the underground mining industry in general and the use of friction stabilizers to support mine roofs was based entirely on *354 his employment experience with plaintiff. Defendant had neither prior knowledge nor experience relevant to underground mining until he joined I-R in 1974. At that time he was in the research department and was assigned several projects dealing with the mining industry. By his testimony, those projects kindled his interest in that industry, including an interest in methods to support mine roofs.
(c) Ciavatta's employment with I-R from 1974 exposed him to creative processes within I-R's organization relevant to the invention. Through the use of regular meetings Dr. McGahan encouraged his research staff to be creative and to share their creativity with their fellow employees. The circumstantial evidence supports the court's finding that Ciavatta responded to this process. He submitted 13 disclosures to I-R while employed in a research and development capacity, many of them related to mining and roof support, a field in which he had no prior experience.
(d) Defendant was enriched through his experience with I-R. His experience with I-R introduced him to an area in which he had none. His enrichment was particularly relevant to the invention in question and came at the hands of an employer possessed of a wealth of experience in designing and producing underground mining equipment, including the friction stabilizers and other roof bolt devices. It is clear that Ciavatta utilized I-R's information, experience, expertise and ideas and the creative interaction gleaned from his employment.
(e) Existence of the holdover clause and its enforcement would not constitute a significant deterrent to a change of employment by Ciavatta. His work experience as an engineer was varied. Between 1950 and 1972 he was employed by five firms in the following fields: manufacture of measuring instrumentation for the processed foods industry; naval torpedoes; pressure transducers and temperature measurement; self-employed designing tooling for Timex, Colt and others; kitchen appliances. In 1972 he was employed by an I-R subsidiary, Miller's Falls Tool Co. It manufactures saws, drills and similar tools for consumers and the construction industry. This clearly is not a case in which an employee's experience has been in a limited field thereby precluding realistic employment opportunities in other fields.
(f) Enforcement would not violate any legitimate expectations of defendant. In 1972, upon accepting employment with the Miller's Falls Tool Co., Ciavatta was required to execute an assignment agreement. Upon being terminated he actively sought employment with other units of I-R. He is charged with knowledge that execution of an assignment agreement is required by I-R. He was hired and signed the agreement at issue. Between 1959 and 1964, while employed at Revere he patented a force transducer which he was required to and did assign to Revere. Finally, in 1979, shortly after he conceived the idea of a roof bolt with an elliptical shape he discussed the existence of the assignment agreement with his counsel.
(g) There is no evidence that defendant pirated trade secrets or utilized confidential information.

*355 (h) There is no evidence that plaintiff's friction stabilizer involved trade secrets. The principles involved in the stabilizer's functioning have been freely discussed by Dr. Scott and others. The specifications and methods of manufacture are easily discoverable.
Factors (g) and (h) militate against enforcement of the agreement but they are outweighed by other factors. Plaintiff seeks to prevent an employee from gaining a competitive position through the use of its pioneering ideas, resources and expertise which have enriched the employee beyond his prior professional experience. Not to enforce the agreement under the circumstances of this case would enable the employee to attain a position of competitive equivalence based in large part on plaintiff's experience and resources. Requiring assignment of inventions conceived within one year of termination is a reasonable response to the problem faced by the employer where enforcement would not unduly restrict the employee's professional opportunities and would not otherwise violate public policy. The one-year hiatus before the employee may utilize the expertise gleaned from his prior employment is a device that tends to blunt the inequity inherent in having the employer's expertise turned against it. On the other hand, the former employee is free to utilize his expertise and inventiveness after the hiatus.
Accordingly, defendant's invention and the patent issued for it, number 4,316,677, issued February 23, 1982 shall be assigned to Ingersoll-Rand. The assignment shall include all foreign patents of the same device.
Patent 4,322,183 issued on March 30, 1982 shall also be assigned. The court is aware that the patent application was filed March 4, 1981, 20 months after termination of defendant's employment. The patent application date is not the date which triggers application of the agreement. The agreement requires assignment of inventions and designs conceived, developed or perfected within one year after termination of employment. The patent in question, which will be referred to as 322 covers an invention described in the abstract as follows:

*356 A mine roof support device comprising an elongated tubular shank having an oblate cross-section providing annularly spaced wall engaging peripheral portions for frictionally engaging the wall of a hole in the strata and annularly spaced non-wall engaging peripheral portions which are spaced radially from the wall of the hole, the exterior wall engaging surfaces of the wall engaging portions being configured such that frictional interengagement with the wall of the hold will result in a radially inward deflection of the wall engaging portions which deflection is accommodated by radially outward deflection of the non-wall engaging portions and a releasably contained charge of hardenable viscous grouting material operable to be applied between the wall of the hole and the exterior periphery of the shank as the latter moves upwardly into the hole while the material of the charge is viscous to thereby reduce by a lubricating action the frictional resistance occasioned by the engagement of the shank within the hole and so as to permit the material of the charge thus applied to harden after the shank has been moved into operative relation with the hole to thereby increase by a cementing action the frictional gripping action between the shank and the mine strata.
This description contains two basic elements, the device and the use of a hardenable viscous grouting material. The description of the device is almost identical to the description in the earlier patent specifically on page six (column 6) of 4,316,677 between lines 15 and 35. The hardenable viscous grouting material has a dual purpose: (1) to provide passive holding action once the grout has hardened; (2) to provide lubrication between the wall of the drilled hole and the outer wall of the device.
The first purpose is similar to the idea expressed by defendant in his September 30, 1975 disclosure. (P-18). Of great significance, however, is the fact that both purposes, but especially the lubrication function, are dependent upon the elliptical shape which is the core of defendant's device. As patent 322 describes, because of the shape of Ciavatta's device some portion of the outer wall of the tube will not engage the wall of the hole thereby creating spaces to accomodate displacement of the viscous grout during insertion. Clearly, the elliptical configuration *357 developed by defendant in the summer of 1979 is the heart of patent 322 and it and its foreign patent are assignable.[4]

Estoppel, Laches and Unclean Hands.
The complaint was filed on April 6, 1984, almost five years after defendant's employment was terminated. Defendant contends that plaintiff unreasonably delayed legal action until defendant had completed development of his device and it had become a factor in the marketplace. Accordingly, defendant argues, plaintiff is barred from relief on theories of estoppel, laches and unclean hands.
The court finds that plaintiff was unaware of defendant's invention until December 1981. Defendant's patents were not issued until February and March 1982. During the first half of 1982 Ciavatta's device was the subject of memoranda within plaintiff's organization. The memoranda reveal some uncertainty about possible infringement of I-R's patents by Ciavatta; they also reveal uncertainty as to the effectiveness and competitiveness of defendant's stabilizer.
In July 1982 plaintiff's patent house counsel wrote to defendant telling him that his invention belonged to I-R under the agreement. Defendant responded by calling the attorney, Tibbot, and telling him that he would not assign his patents, that they belonged to him and that he had an opinion of counsel to that effect.
This court, by its order of February 22, 1985 granted partial summary judgment to plaintiff as to the defense of estoppel "to the extent that the court finds that as of July 8, 1982, defendant abandoned any reliance based on any lack of action by defendant Ingersoll-Rand." That finding was based on Ciavatta's unequivocal deposition testimony that as of July 1982 he was committed to his project and would not have abandoned it or assigned his patent to I-R even if I-R had commenced suit.
*358 There is no credible evidence to establish that defendant's attitude was any different from December 1981 to July 1982. One of defendant's earliest steps was to procure a copy of the agreement from I-R in the summer of 1979 (without telling I-R the reason for his request) and send it to his lawyer. By the fall of 1979 defendant had an opinion of counsel that the agreement was not enforceable. His first patent application was filed in March 1980. In July 1980 he was looking for venture capital. It is clear and the court finds that defendant was irrevocably committed to development and marketing of his project before I-R knew of its existence and that no action taken by I-R after December 1981 would have changed defendant's plans or deflected his resolve.
Defendant argues that plaintiff should be barred from the requested relief because I-R waited until defendant's product became a factor in the marketplace before it commenced suit. The court agrees that I-R started suit in 1984 because by that time defendant's device was attaining some acceptance in the marketplace and was becoming a competitive factor.
The court rejects defendant's argument. Defendant did not rely on plaintiff's inaction. To accept the argument would require commencement of litigation before it was clear that the litigation had a practical purpose, i.e., before it was clear that the device had some value. There is nothing to be gained from adopting a rule requiring commencement of litigation to force assignment of a device, which, though patented, has no practical value. Litigation should not be entered into lightly. It costs money. It diverts the energies and attentions of the litigators. Litigation as an academic exercise imposes an unnecessary burden on the courts. Although suit was commenced because defendant's device was gaining some marketplace acceptance, that acceptance was not widespread but in a nascent state when the complaint was filed. Plaintiff should not be penalized because it exercised restraint and waited until there was some practical advantage to be gained from litigation.
*359 Plaintiff shall submit a form of judgment consistent with this opinion.[5]
NOTES
[1] Both plaintiffs will be referred to in the singular as Ingersoll-Rand.
[2] For a classic example of this process leading to the discovery of DNA, see Watson, "The Double Helix," Atheneum (1968).
[3] If defendant's position is correct, the holdover clause is a nullity because former employees are prohibited from utilizing the employer's trade secrets or confidential information even in the absence of an agreement. Sun Dial Corp. v. Rideout, 16 N.J. 252 (1954).
[4] Patent 322 describes the application as a "continuation-in-part of Ser. No. 127,959, Mar. 7, 1980." That is the application for patent 4,316,677.
[5] Plaintiff also seeks an accounting. However, an issue which has not been briefed or discussed is whether defendant is entitled to reimbursement of development costs. The court expresses no opinion on that issue at this time.