INGERSOLL-RAND COMPANY, A NEW JERSEY CORPORATION, AND INGERSOLL-RAND RESEARCH, INC., A DELAWARE CORPORATION, PLAINTIFFS-APPELLANTS, v. ARMAND CI-AVATTA, A RESIDENT OF NEW JERSEY, DEFENDANT-RE-SPONDENT.

Argued January 4, 1988—Decided June 22, 1988.

610

*John M. Calimafde,* a member of the New York bar, argued the cause for appellants (*Woolson, Guterl, Sutphen and Anderson,* attorneys; *Mark S. Anderson,* on the brief).

*Charles J. Walsh* argued the cause for respondent (*Sills, Beck, Cummis, Zuckerman, Radin, Tischman & Epstein,* attorneys; *Charles J. Walsh* and *Stuart M. Feinblatt,* on the brief).

The opinion of the Court was delivered by

GARIBALDI, J.

The issue in this appeal is the enforceability of an employee invention "holdover" agreement. Specifically, the issue presented is whether a "holdover" clause requiring an employee to assign a post-termination invention that does not involve an employer's trade secret or proprietary information is enforceable. The products relevant to this dispute are a new type of friction stabilizer, which defendant invented and patented, and a split-set friction stabilizer, manufactured and distributed by plaintiff. Both devices are used in the mining industry to prevent the fall of rock from the roof and walls of underground mines. The Appellate Division reversed the Chancery Division's ruling in favor of plaintiff. 216 *N.J.Super.* 667 (1987). We affirm.

I

Plaintiff Ingersoll–Rand Company is a New Jersey corporation with its corporate headquarters in Woodcliff Lakes, New Jersey. Plaintiff Ingersoll–Rand Research, Inc. is a wholly-owned subsidiary of Ingersoll–Rand and is located in Princeton, New Jersey. For purposes of this opinion, we refer to plaintiffs collectively as Ingersoll–Rand.

Ingersoll–Rand is engaged in the research, development, manufacture, and sale of products for use in various heavy industries. It does business through more than thirty divisions, which are organized into eleven business groups that cover a broad range of technology, including air compressors, construction equipment, mining machinery, oil field products, and tools. Ingersoll–Rand's sales exceed $2 billion and the company dedi-

cates approximately 3.5% to 4.0% of its revenues, or $70–80 million, to research and development.

Historically, one of the dangers of underground mining is the potential collapse of a mine's rock roof. Several methods and devices have been employed to stabilize the strata of rock layers in the roof of a mine. In 1973, Dr. James Scott, a Professor of Mining Engineering at the University of Missouri, conceived of the friction stabilizer roof support system and communicated with Ingersoll–Rand regarding the development of this concept. Ingersoll–Rand, working with Dr. Scott, expended substantial sums on the research and development of the product.[1] On December 2, 1975, the United States Patent Office issued the first patent for Dr. Scott's friction stabilizer. Dr. Scott subsequently assigned the patent to Ingersoll–Rand. In February 1977 Ingersoll–Rand began marketing its stabilizer under an agreement with Dr. Scott.

The Ingersoll–Rand split-set friction stabilizer consists of a tubular metal element that is larger in diameter than a pre-drilled hole formed in the roof of a mine. The stabilizer is forcibly inserted in the hole. As the stabilizer is forced into the pre-drilled hole, it undergoes radical deformation, causing the tube to react outwardly against the surface defining the hole. This force provides a frictional grip along the length of the tube, which stabilizes the rock strata of the roof. An example of a simple friction stabilizer would be a nail driven into a piece of wood. Ingersoll–Rand's friction stabilizer represented a breakthrough in mine roof support equipment.

The development of Ingersoll–Rand's roof stabilizer was well documented in the industry. Ingersoll–Rand, beginning in the

---

[1]The trial court found that from 1973 through 1976 Ingersoll–Rand expended $518,379 on its development program of the friction stabilizer and an additional $844,306 in 1977 and 1978. These amounts included an allocation of research and development overhead and the 1977 and 1978 amounts included efforts to develop drilling equipment related to the stabilizer. 210 *N.J.Super.* 339, 342 (Ch.Div.1986).

mid–1970s, extensively marketed and promoted the product through advertisements, pamphlets, and technical articles. These publications thoroughly detailed the stabilizer's configuration, composition, method of operation, test results, performance capabilities, and sales information. The technology employed to manufacture the device is over fifty years old.

The split set stabilizer has been a very successful product for Ingersoll–Rand. It represented over half of all stabilizer units sold in the United States for metal and non-metal mines, with over one million units sold in 1984. Ingersoll–Rand controls over ninety percent of the sub-market for friction stabilizers. Ingersoll–Rand has never reduced the price of the split set below list in response to competition; and prior to 1983, when the defendant's company, Safeguard Energy Products, Inc., entered the market, only one other competitor was in the submarket: Atlas Copco Corporation. The design of Atlas Copco's friction stabilizer is identical to a configuration of the Ingersoll–Rand stabilizer sketched by Dr. Walter McGahan of Ingersoll–Rand Research on December 10, 1978. Friction stabilizers, however, do compete with other methods of roof stabilization.

Defendant, Armand Ciavatta, is a 57–year-old engineer. He was graduated from the Rhode Island School of Design in 1953 with a Bachelor of Science degree in machine design. Subsequently, he took classes in mining, tunneling, and heavy construction engineering as well as graduate business classes. Since 1950, Ciavatta has held a number of technical engineering positions involving a variety of engineering principles, including: working for a division of General Signal Corporation on instrumentation used in weight and volume measurement; conducting quality control tests for instrumentation used in the first commercial nuclear reactor; as chief project engineer for the Revere Corporation of America where he worked with transducers and other force-measuring devices; and as Vice President of Engineering and Quality Control for Iona Corporation, where he was responsible for engineering development

and testing of the company's line of kitchen and consumer appliances. He was also self-employed for a period of six years when he provided engineering consulting services in a variety of areas, including manufacturing, valve engineering, tooling, public opinion testing, and market research. While employed by Revere Corporation, Mr. Ciavatta invented and obtained a patent for a force transducer using strain gauges. Although he had no agreement with his employer, he nevertheless assigned this patent to Revere.

Ciavatta joined the Millers Falls Division of Ingersoll–Rand as Director of Engineering and Quality Control in 1972. From 1972 to 1974, Ciavatta was responsible for quality control and materials management in the production of hand and electric tools. In the fall of 1974, the company terminated his employment in the Millers Falls Division, at which time he became Program Manager with Ingersoll–Rand Research, Inc. As a condition of his employment with Ingersoll–Rand Research, he executed an "Agreement Relating to Proprietary Matter" (Proprietary Agreement) in which he agreed, in pertinent part:

1. To assign and I hereby do assign, to the COMPANY, its successors and assigns, my entire right, title and interest in and to all inventions, copyrights and/or designs I have made or may hereafter make, conceive, develop or perfect, either solely or jointly with others either

(a) during the period of such employment, if such inventions, copyrights and/or designs are related, directly or indirectly, to the business of, or to the research or development work of the COMPANY or its affiliates, or

(b) with the use of the time, materials or facilities of the COMPANY or any of its affiliates, or

(c) within one year after termination of such employment if conceived as a result of and is attributable to work done during such employment and relates to a method, substance, machine, article of manufacture or improvements therein within the scope of the business of the COMPANY or any of its affiliates.

Additionally, in Paragraph 4 of the Agreement, Ciavatta agreed:

4. Not to divulge, either during my employment or thereafter to any person, agency, firm or corporation, any secret, confidential or other proprietary information of the COMPANY or any of its affiliates which I may obtain through my employment without first obtaining written permission from the COMPANY.

Ciavatta signed this Agreement on October 1, 1974, and at that time he had read and understood its terms.

While employed by Ingersoll–Rand Research as a Program Manager from October 1974 through March 1978, Ciavatta worked on a variety of development projects, other than those relevant to this litigation, including a tunneling device and the development of coal haulage machinery. As a result of his participation in these development projects, Ciavatta became interested in underground mining and read extensively the industry literature on the subject. From 1974 to 1978, Ciavatta never was formally involved in or assigned to research or development relevant to the friction stabilizer. Nevertheless, Dr. McGahan, the Director of Research, encouraged the research staff to be creative, to discuss ideas for projects or potential projects beyond those to which they had been assigned. These ideas were to be submitted on disclosure forms. Through 1975, Ciavatta submitted thirteen patent disclosures to his employer for mining technology and instrumentation. Five of the thirteen proposals were for devices to support or stabilize roofs of underground mines. Four of the five invention disclosures were not friction stabilizers, but one was an improvement to Ingersoll–Rand's split-set. Ciavatta's work during this period was his first exposure to mining support equipment. Ingersoll–Rand chose not to pursue any of his concepts. Thereafter, defendant claims, he lost his motivation to invent and did not originate any additional concepts while employed by Ingersoll–Rand.

In March 1978, the company transferred Ciavatta to the Split Set Division of Ingersoll–Rand Equipment Corp. While there, he served as Manufacturing Manager and Quality Control Manager. Ingersoll–Rand does not fabricate the stabilizer in any of its plants. Rather, it contracts with two vendors who manufacture the Split Set roof stabilizers, which Ingersoll–Rand then sells to the mining industry. As manager of manufacturing, it was Ciavatta's position to administer the manufacturing program. His responsibilities in that post included supervising the

manufacture, production, quality control, and distribution of Ingersoll–Rand's Split Set roof stabilizers. During this period, the company did not employ Ciavatta to design, invent, or modify the basic configuration of its Split Set roof stabilizer, and in fact he did not do so. Ciavatta did, however, have access to Ingersoll–Rand's manufacturing drawings, materials, and specifications. Ingersoll–Rand considers all of that information confidential, although the information had been published in industry trade publications. At the Ingersoll–Rand Research Center the company maintains a security system in order to ensure the confidentiality of its information. Drawings are stamped proprietary, visitors are escorted while in the Ingersoll–Rand Research Center, vendors must sign proprietary information agreements, and all employees must enter into a Proprietary Master Agreement similar to that at issue in this case.

In the spring of 1979, as a result of certain quality control problems, Ciavatta stopped certain shipments of the stabilizer and recommended that the vendors modify their production process. Ciavatta's superior countermanded this directive and directed the vendors to make their scheduled shipments. Subsequently, in June of that year, Ingersoll–Rand terminated Ciavatta's employment. Ciavatta claims that the company did not offer any explanation for his termination; the company claims it terminated his employment because of unsatisfactory performance and his poor relations with fellow employees.

After his termination, Ciavatta circulated more than one hundred resumes seeking employment with other engineering firms. From February to July 1980, he briefly obtained employment as general manager of a bankrupt company located in Michigan.

Ciavatta asserts, and the trial court found, that he first conceived of the invention in dispute in the summer of 1979 while unemployed and off the Ingersoll–Rand payroll. Apparently, he was installing a light fixture in his home when he first

conceived of his invention, an elliptical metal tube designed to stabilize the roofs of mines. While searching for employment following his discharge from Ingersoll–Rand, Ciavatta intermittently worked on his design. He completed his first sketch of the stabilizing device on August 25, 1979, approximately two months after Ingersoll–Rand fired him. Ciavatta's stabilizer differs from Ingersoll–Rand's in two respects: its tubular portion is closed rather than split, and the tube is elliptical in shape.

As he continued to develop the stabilizing device, Ciavatta consulted a patent attorney to determine his rights with regard to the device. At his attorney's request, Ciavatta obtained a copy of the Ingersoll–Rand employee Proprietary Agreement he had signed when beginning his employment with Ingersoll–Rand Research. He did not inform Ingersoll–Rand of his activities with respect to his roof support system. By letter dated October 24, 1979, his attorney advised Ciavatta that "this invention is yours and Ingersoll has no enforceable claim thereto."

After his brief employment with the bankrupt company in Michigan, Ciavatta returned to his work on the stabilizing device and began refining the system in a more systematic manner. Although still looking for employment, he "started to go through significantly more calculations," and obtained sample tubing to run experimental tests. In March 1980, nine months after his termination, Ciavatta filed for a United States patent on the device and was awarded U.S. Patent No. 4,316677 in February 1982. Subsequently, in March 1982, Ciavatta received a second patent, U.S. Patent No. 4322183, which involved an improvement to the roof stabilizer protected by Ciavatta's first patent.

In July 1980, Ciavatta prepared a business plan and solicited venture capital from a number of firms, including Kerr McGee Co. and United Nuclear Corp. These financing efforts failed, however, and Ciavatta used his life savings and borrowed over

$125,000 from his brother and a bank to take his invention to the marketplace. Ciavatta exhibited his now-patented invention at a trade show in October 1982, and sales of his product then began. He made his first sale in January 1983. Sales for 1983 totalled approximately $30,000. By the time that the trial of this case commenced in June 1985 his total sales approximated $270,000. Ciavatta's stabilizer sells for approximately 15% less than Ingersoll–Rand's stabilizer. The trial court observed "[t]he market place has begun to accept defendant's product and his device appears to be a competitive threat to plaintiff's device." 210 *N.J.Super.* at 344.

The parties disagree on when Ingersoll–Rand learned of Ciavatta's invention. The company acknowledges that it had learned of the model for his invention by December 1981 or early 1982. In July 1982, Ciavatta received a letter from Ingersoll–Rand's patent counsel requesting that he assign his patent to the company. Ciavatta communicated to Ingersoll–Rand that his lawyer had advised him that he was not obligated to assign his patent to his former employer. Simultaneously, Ingersoll–Rand employees prepared several internal memoranda analyzing the feasibility of Ciavatta's product and its potential competitive impact. Ingersoll–Rand, now aware of the challenge posed by Ciavatta's invention, began to consider competitive responses to the introduction of the invention in the market.

In September 1983, after Ciavatta had sold his product to several Ingersoll–Rand customers, the company decided to lower the price of its split set stabilizer and to commence this lawsuit.

Ingersoll–Rand initiated suit against Ciavatta on April 17, 1984, alleging that the defendant had violated the employment agreement by failing to assign the invention and related patents that he conceived after leaving Ingersoll–Rand. Specifically, Ingersoll–Rand sought assignment of the patent for Ciavatta's friction stabilizer and an accounting for profits. Ciavatta

denied that he had violated the agreement or that he was obligated to make the assignment. He also asserted a number of affirmative defenses including unenforceability of the agreement, estoppel, laches, and unclean hands. The trial court rejected these claims.

Ciavatta was subsequently granted leave to amend his answer to add a counterclaim for alleged libel and unfair competition. Defendant's counterclaim was severed for the purpose of trial, as was the accounting requested by Ingersoll–Rand.

The issue of Ciavatta's liability for breach of contract was tried without a jury. Ingersoll–Rand attempted to prove that Ciavatta had stolen his invention and that he had relied on Ingersoll–Rand's trade secrets or other confidential information in conceiving his product. Ciavatta argued that the "holdover" clause is unenforceable in the absence of a finding that the invention was based on the employer's trade secrets or other confidential information, relying on our decisions concerning the enforceability of an employee's covenant not to compete, in *Solari Industries Inc. v. Malady*, 55 *N.J.* 571 (1970), and *Whitmyer Bros., Inc. v. Doyle*, 58 *N.J.* 25 (1971).

The trial court made detailed factual findings establishing that Ciavatta did not pirate any trade secrets or confidential information in conceiving his invention. Indeed, the trial court found that Ingersoll–Rand's split set technology "does not involve trade secrets or other confidential information since the specifications, methods of manufacture and operating principles relating to the device are available to the public or are easily discoverable." 210 *N.J.Super.* at 355. Ingersoll–Rand's "manufacturing process has been in existence for over 50 years. Anyone can buy plaintiff's product, observe it, measure it and analyze its steel content. In short, there does not appear to be anything secret about it or the principles it utilizes." *Id.* at 353.

Nevertheless, the trial court enforced the agreement, concluding that the *Solari/Whitmyer* reasonableness test was

inapplicable to holdover agreements. Instead, the court articulated a general reasonableness test and determined that the balance tilted in favor of Ingersoll–Rand because Ciavatta's "knowledge of the underground mining industry was based entirely on his employment experience with Ingersoll–Rand," and he had been "enriched" by the company's non-confidential ideas and by his access to Ingersoll–Rand's "information, experience, expertise and ideas and the creative interaction gleamed from his employment with the company." The court also determined that Ciavatta's engineering experience was so diverse that "assignment of this specific invention did not unreasonably preclude realistic employment opportunities in other fields." 210 *N.J.Super.* at 353–55. On March 20, 1986, the trial court entered judgment on its decision and certified it as a final judgment, although the issue of damages and defendant's counterclaim remain to be resolved. The trial court stayed its judgment pending completion of the appellate process. Defendant Ciavatta filed a timely Notice of Appeal on May 2, 1986.

The Appellate Division accepted the trial court's factual determination but reversed the judgment, reasoning that the principles enunciated in the *Solari/Whitmyer* decisions should apply. 216 *N.J.Super.* at 671–72. Applying the *Solari/Whitmyer* reasonableness test, the Appellate Division concluded that Ingersoll–Rand's legitimate interests were protected since none of the company's trade secrets or other confidential information was used by Ciavatta in devising his invention, that enforcement of the agreement would "impose upon the employee a prohibition effective for one-year over an unlimited geographical area, from working on mine supports for any company in the mining industry," and result in a "lessen[ing] [of] competition and keep[ing] potentially competitive products from the market." *Id.* at 672–76.

Accordingly, the Appellate Division reversed the trial court's judgment and remanded the case to the Chancery Division for the dismissal of the company's complaint and for trial of the

defendant's counterclaim. We granted Ingersoll–Rand's petition for certification, 108 *N.J.* 192 (1987).

## II

Paragraph 1(c) of Ciavatta's Proprietary Agreement with Ingersoll–Rand comprises a one-year so-called "holdover" agreement under which the employee promises to assign his or her "entire right, title and interest" in any invention he or she creates during a one-year period following termination of employment if that invention is "conceived as a result of and is attributable to work done during such employment." The central question presented in this case is the enforceability of that covenant.

The common law regards an invention as the property of the inventor who conceived, developed, and perfected it. *International Pulverizing Corp. v. Kidwell*, 7 *N.J.Super.* 345, 348 (Ch. Div.1950); *Blum v. Commissioner of Internal Revenue*, 183 *F.*2d 281 (3rd Cir.1950); *New Jersey Zinc Co. v. Singmaster*, 71 *F.*2d 277, 279 (2nd Cir.), *cert.* denied, 293 *U.S.* 591, 55 *S.Ct.* 106, 79 *L.Ed.* 685 (1934); 56 C.J.S. *Master and Servant* § 73 (1948); 53 *Am.Jur.*2d *Master and Servant* § 111 (1970); 2 L. Altman, *Callman's Unfair Competition, Trademarks and Monopolies* § 14.27 (4th ed. 1982). The Supreme Judicial Court of Massachusetts accurately summarized the common-law position in *National Development Co. v. Gray*, 316 *Mass.* 240, 246, 55 *N.E.*2d 783, 786 (1944):

One by merely entering an employment requiring the performance of services of a noninventive nature does not lose his rights to any inventions that he may make during the employment ... and this is true even if the patent is for an improvement upon a device or process used by the employer or is of such great practical value as to supersede the devices or processes with which the employee became familiar during his employment.... The law looks upon an invention as the property of the one who conceived, developed and perfected it, and establishes, protects and enforces the inventor's rights in his invention unless he has contracted away those rights.

Thus, employment alone does not require an inventor to assign a patent to his employer. Absent a specific agreement,

an employed inventor's rights and duties with respect to an invention or concept arise from the inventor's employment status when he actually designed the invention. *See* Note, "Patent Ownership: An Employer's Right to His Employee's Invention," 58 *Notre Dame L.Rev.* 863, 866 (1983).

■ Generally, where an employer hires an employee to design a specific invention or solve a specific problem, the employee has a duty to assign the resulting patent. Where the employee is not hired specifically to design or invent, but nevertheless conceives of a device during working hours with the use of the employer's materials and equipment, the employer is granted an irrevocable but non-exclusive right to use the invention under the "shop right rule." A shop right is an employer's royalty or fee, a non-exclusive and non-transferable license to use an employee's patented invention. *See United States v. Dubilier Condenser Corp.*, 289 *U.S.* 178, 188, 53 *S.Ct.* 554, 557, 77 *L.Ed.* 1114, 1119 (1932); *Kinkade v. New York Shipbuilding Corp.*, 21 *N.J.* 362, 369–71 (1956); 9 S. Williston, *A Treatise On the Law of Contracts* § 1016, at 110 (3d ed. Jaeger 1967 & Supp.1987).

Since the common-law doctrines are vague and ambiguous in defining the rights of employers and employees in employees' inventions, most employers use written contracts to allocate invention rights. *Jamesbury Corp. v. Worcester Valve Co.*, 443 *F.*2d 205, 214 (1st Cir.1971); Note, "Reform for Rights of Employed Inventors," 57 *S.Cal.L.Rev.* 603, 608 (1984) (hereinafter Note, "Reform"); Gullette, "State Legislation Governing Ownership Rights in Inventions Under Employee Invention Agreements," 62 *J.Pat.Off.Socy.* 732, 738 (1980). Such contracts requiring an employee to assign to the employer inventions designed or conceived during the period of employment are valid. *Misani v. Ortho Pharmaceutical Corp.*, 44 *N.J.* 552, *appeal dismissed,* 382 *U.S.* 203, 86 *S.Ct.* 398, 15 *L.Ed.*2d 270 (1965); *Bandag, Inc. v. Morenings,* 259 *Iowa* 998, 146 *N.W.*2d

916 (1966); *Cahill v. Regan*, 5 *N.Y.*2d 292, 184 *N.Y.S.*2d 348, 157 *N.E.*2d 505 (1959).

The contractual allocation of invention rights between employers and employees is especially critical given the fact that 80% to 90% of all inventions in the United States are made by employed inventors. See *Rights of Employed Inventors, 1982: Hearings on H.R. 4732 and H.R. 6635 Before the House Subcomm. on Courts, Civil Liberties, and the Administration of Justice,* 97th Cong., 2d Sess. 1 (1982) (remarks of Rep. Kastenmeier) (quoting Patent Office report stating that 84% of the U.S. patents go to corporate assignees); Note, "Reform," *supra,* 57 *S.Cal.L.Rev.* at 604 & n. 12. The United States is not alone in this regard. In West Germany, 60% to 75% of all inventions come from employed inventors; in France the figure is 70% to 75%. In both countries, 90% of all *useful* inventions are made by employees. Commission of the European Communities, "Comparative Study of Employees' Inventions Law in the Member States of the European Communities," 2 *Collective Studies, Labour Law Series* 9 (1977).

■ Most large, technologically advanced companies today require their employees by contract to assign their patents to their employers. Note, "Patent Ownership: An Employer's Rights to His Employee's Invention," 58 *Notre Dame L.Rev.* 863, 864 (1983). Courts, however, will not enforce invention assignment contracts that unreasonably obligate an employee in each and every instance to transfer the ownership of the employee's invention to the employer. Comment, "Employer's and Employee's Rights in Patents Arising from the Employment," 11 *Vill.L.Rev.* 823 (1966). Additionally, several states have recently adopted legislation that delimits employer-employee invention assignment agreements. Those statutes restrict the instances in which employers may compel the assignment of employee inventions. See *Minn.Stat.Ann.* § 181.78 (1980); *N.C.Gen.Stat.* § 66–57.1 to 57–2 (1981); *Wash.Rev.Code Ann.* § 49.44.140 (1987); *Cal.Lab.Code* § 2870 (West 1987).

All of these statutes provide that any employee invention assignment agreement that purports to give employers greater rights than they have under the statute is against public policy and, consequently, unenforceable.[2]

In the instant case, the contract involves the assignment of future or post-employment inventions. Contractual provisions requiring assignment of post-employment inventions are commonly referred to as "trailer" or "holdover" clauses. The public policy issues involved in the enforceability of these holdover clauses reflect the dichotomy of our views on the rights of an inventor and rights of an employer. Our society has long recognized the intensely personal nature of an invention and the importance of providing stimulation and encouragement to inventors. Some commentators believe that the existing patent system does not present sufficient motivation to an employee-inventor. These commentators allege that the United States is in danger of losing its position as technology leader of the world. They cite for support that America is experiencing a declining patent balance and is less patent-productive than many foreign countries. More and more United States patents

---

[2]The California statute provides:

§ 2870   Employment agreements; assignment of rights

(a) Any provision in an employment agreement which provides that an employee shall assign, or offer to assign, any of his or her rights in an invention to his or her employer shall not apply to an invention that the employee developed entirely on his or her own time without using the employer's equipment, supplies, facilities, or trade secret information except for those inventions that either:

(1) Relate at the time of conception or reduction to practice of the invention to the employers business, or actual or demonstrably anticipated research or development of the employer.

(2) Result from any work performed by the employee for the employer.

(b) To the extent a provision in an employment agreement purports to require an employee to assign an invention otherwise excluded from being required to be assigned under subdivision (a), the provision is against the public policy of this state and is unenforceable. [Cal.Lab.Code § 2870.]

The statutes in California and North Carolina place the burden of proof on the employee claiming the benefit of the statute. Cal.Lab.Code § 2872; N.C.Gen.Stat. § 66–57.1.

are not issued to United States citizens and companies but to foreigners. Note, "Reform," *supra,* 57 *S.Cal.L.Rev.* at 622; Note, "Patent Ownership: An Employer's Rights to His Employee's Invention," *supra,* 58 *Notre Dame L.Rev.* at 864. Interestingly, Japan, which began tying employed inventors' compensation to the market value of the invention in 1959, has witnessed a dramatic increase in the number of inventions generated by employed inventors. Stipp, "Inventors Are Seeking Bigger Share of Gains from Their Successes, *Wall St. J.,* Sept. 9, 1982, at 1, col. 6.

To encourage an inventor's creativity, courts have held that on terminating his employment, an inventor has the right to use the general skills and knowledge gained through the prior employment. *See Boost v. Faunce,* 17 *N.J.Super.* 458, 464 (App.Div.1952); Note, "Patent Ownership," *supra,* 58 *Notre Dame L.Rev.* at 878. Moreover, an employee may compete with his former employer on termination. *See Whitmyer Bros., Inc. v. Doyle, supra,* 58 *N.J.* at 33. Nonetheless, it is acknowledged that the inventive process is increasingly being supported and subsidized by corporations and governments. It is becoming a more collective research process, the collective product of corporate and government research laboratories instead of the identifiable work of one or two individuals. Stedman, "Rights and Responsibilities of the Employed Inventor," 45 *Ind.L.J.* 254 (1974). Employers, therefore, have the right to protect their trade secrets, confidential information, and customer relations. *Whitmyer Bros., Inc. v. Doyle, supra,* 58 *N.J.* at 32–33; *Solari Indus., Inc. v. Malady, supra,* 55 *N.J.* at 576. Thus, employees and employers both have significant interests warranting judicial attention.

■ In view of the competing interests involved in holdover agreements, courts have not held them void *per se.* Rather, the courts apply a test of reasonableness. *See generally* Knoth, "Assignment of Future Inventions," 27 *Chi.-Kent L.Rev.* 295, 296 (1949) ("As a broad proposition, contracts that are unrea-

sonable are unenforcible; that is, if the restraints imposed are unlimited as to time, space or subject matter."). Moreover, courts strictly construe contractual provisions that require assignment of post-employment inventions; they must be fair, reasonable, and just. *Gas Tool Patent Corp. v. Mould*, 133 *F.*2d 815 (7th Cir.1943); *Deller's Walker on Patents* § 374, at 474 (1966); 6A A. Corbin, *Corbin on Contracts* § 1934A, at 106 (1962). Generally, a clause is unreasonable if it: (1) extends beyond any apparent protection that the employer reasonably requires; (2) prevents the inventor from seeking other employment; or (3) adversely impacts on the public. *See Dorr–Oliver, Inc. v. United States*, 432 *F.*2d 447, 193 *Ct.Cl.* 187 (1970); *GTI Corp. v. Calhoon*, 309 *F.Supp.* 762 (S.D.Ohio 1969); *Universal Winding Co. v. Clarke*, 108 *F.Supp.* 329 (D.Conn.1952); Note, "Patent Ownership," *supra*, 58 *Notre Dame L.Rev.* at 879.

New Jersey courts previously have not specifically addressed the enforceability of a "holdover" clause. We have, however, addressed the enforceability of analogous employee noncompetition contracts. We find that our determination of the enforceability of those post-contracts is applicable to our determination in this case of the enforceability of "holdover" clauses. *See Whitmyer Bros., Inc. v. Doyle, supra; Solari Indus., Inc. v. Malady, supra.*

*Solari* was an appeal from the denial of an employer's application for an injunction against a former employee's breach of a noncompetition provision in his employment contract. After termination of his employment, defendant went out of the country and obtained a franchise to sell a competing firm's product in the United States. The former employer sued, claiming breach of the noncompetition clause of its former employee's employment contract. The Chancery Division denied injunctive relief, and the employer appealed. We remanded after concluding that such provisions were enforceable, and held that the plaintiffs are entitled

to that limited measure of relief within the terms of the noncompetitive agreement which is reasonably necessary to protect their legitimate interests,

will cause no undue hardship on the defendant, and will not impair the public interest. [*Solari Indus., Inc. v. Malady, supra*, 55 *N.J.* at 585.]

In *Whitmyer Bros., Inc. v. Doyle*, plaintiff brought suit against a former employee to enforce an agreement executed by the employee not to compete after termination of employment. The Chancery Division granted plaintiff a preliminary injunction and this Court reversed. We concluded that defendant was unlikely to injure plaintiff's government contracting business by his formation of a competing firm. Defendant argued, and this Court agreed, that he had not taken any trade secrets or confidential information nor had he interfered with the good will of his former employer's business. 58 *N.J.* at 31. Defendant acknowledged that he acquired general knowledge and trade skills from his employment with plaintiff, but contended that he had the "right to use that general knowledge or skill in the only business he kn[ew] in competition with his former employer, and that the restrictive covenant [could] not lawfully or justly be enforced to preclude such use." *Ibid.* We denied the employer's request for a preliminary injunction.

In *Solari* and *Whitmyer*, we articulated a three-part test to determine the validity of a noncompetition covenant in an employment contract. Under those cases, a court will find a noncompetition covenant reasonable if it "simply protects the legitimate interests of the employer, imposes no undue hardship on the employee and is not injurious to the public." *Whitmyer Bros., Inc. v. Doyle, supra*, 58 *N.J.* at 32–33. *Solari* and *Whitmyer* both recognize as legitimate the employer's interest in protecting trade secrets, confidential information, and customer relations. *See also A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 *N.J.* 235 (1949) (holding employee noncompetition clauses valid if reasonably necessary for protection of business of employer, not unreasonably restrictive in point of time or territory or rights of employee, and not prejudicial to public); *Hudson Foam Latex Prods., Inc. v. Aiken*, 82 *N.J.Super.* 508 (App.Div.1964) (holding contract provision prohibiting employee from working for employer en-

gaged in similar business unenforceable without geographic limitation). Since adopting the three-part *Solari/Whitmyer* test, New Jersey courts have addressed similar questions with respect to lawyers, *Dwyer v. Jung*, 133 *N.J.Super.* 343 (Ch. Div.), *aff'd*, 137 *N.J.Super.* 135 (App.Div.1975) (restrictive covenants among attorneys are *per se* unreasonable); doctors, *Karlin v. Weinberg*, 77 *N.J.* 408 (1978) (rejecting *per se* rule of unenforceability with respect to physicians); accountants, *Mailman, Ross, Toyes, & Shapiro v. Edelson*, 183 *N.J.Super.* 434 (Ch.Div.1982) (accounting firm alleged insufficient encroachments on business interests to warrant enforcement of covenant); and management and consulting firms, *A.T. Hudson & Co., Inc. v. Donovan*, 216 *N.J.Super.* 426 (App.Div.1987) (enforcing two-year restriction because employer has legitimate interest in protecting his customer relationships).

In *Raven v. A. Klein & Co., Inc.*, 195 *N.J.Super.* 209 (1984), the Appellate Division applied the *Solari/Whitmyer* test in a case involving the enforcement of trade secret protection and noncompetition provisions in an employment agreement. The agreement provided trade secret protection "during or after the course of employment" and further for noncompetition with defendant "for a period of ten years." *Id.* at 213. The court began its analysis by stating that the law in New Jersey is that "restrictive covenants will be enforced to the extent that they are reasonable as to time, area and scope of activity, necessary to protect a legitimate interest of the employer, not unduly burdensome upon the employee, and not injurious to the public interest." *Id.* (citing *Solari Indus., Inc. v. Malady, supra*, 55 *N.J.* at 585). The court observed that it would not enforce restrictive covenants "principally directed at lessening competition." *Raven v. A. Klein & Co., Inc., supra*, 195 *N.J.Super.* at 213. Any restrictive covenant, if it is to be judicially enforced, "must be directed at protecting the employer's legitimate interests, here urged to be its trade secrets." *Ibid.* Trade secrets or confidential information, according to the court, "cannot merely be the facility, skill or experience learned or developed

during an employee's tenure with an employer." *Id.* at 213–14 (citing *Whitmyer Bros., Inc. v. Doyle, supra,* 58 *N.J.* at 25, 37). The court determined that the employer had demonstrated seven trade secrets appropriated by the former employee that together constituted " 'a manufacturing technique, a processing technique which is unique to Klein and which is not generally known throughout the industry.' " 195 *N.J.Super.* at 214. Such trade secrets, the court concluded, are "protectable under both the employment agreements and the common-law protection afforded to such trade secrets." 195 *N.J.Super.* at 214; *see also Sun Dial Corp. v. Rideout,* 16 *N.J.* 252, 259 (1954) (employer entitled to relief where "the employees learned their employer's trade secret in confidence and in violation of their confidence used or disclosed it after termination of their employment").

Courts in other jurisdictions that have considered specifically the question of the enforceability of holdover agreements generally apply a "reasonableness" test consistent with our *Solari/Whitmyer* test. The Court of Appeals for the Sixth Circuit, in *New Britain Machine Co. v. Yeo,* 358 *F.*2d 397 (1966), reiterated the rule for interpreting a contract requiring the assignment of future patents and future improvements:

"It is well settled that an agreement to assign a patent and improvements thereon covers only improvements existing at the time the agreement was entered into unless the language specifically refers to future improvements. The law does not look favorably upon covenants which place 'a mortgage on a man's brain, to bind all its future products.'

\*       \*       \*       \*       \*       \*       \*       \*

[T]o effect an assignment of future improvements to a patent which the inventor may thereafter produce 'the language of the contract must be very plain and evidence unmistakably that such an agreement was in the mind of the inventor.' "

[*New Britain Mach. Co. v. Yeo, supra,* 358 *F.*2d at 405 (quoting *De Long Corp. v. Lucas,* 176 *F.Supp.* 104 (S.D.N.Y.1959), *aff'd,* 278 *F.*2d 804 (2nd Cir.), *cert. denied,* 364 *U.S.* 833, 81 *S.Ct.* 71, 5 *L.Ed.*2d 58 (1960)).]

Similarly, in *GTI Corp. v. Calhoon,* 309 *F.Supp.* 762 (S.D. Ohio 1969), an employee agreed to

"*disclose* fully to the Company immediately upon origination or acquisition thereof, any and all inventions, discoveries [and] improvements ... discovered, developed or secured by him, solely or jointly with others or otherwise, during his employment by the Company and during a period of five years after the termination of such employment ... which may be directly useful in, or related to, the composition, manufacture, production, sale, application or use of any and all manner of machinery for the manufacture of parts of solid-state electronic components or semiconductors and any other article or articles of like or similar matter, or any other article or articles used by, sold or manufactured by the Company...." [*Id.* at 765.]

In holding that the holdover clause was void, the court reasoned that a former employee is not required "to search his mind for all thoughts relating to the employer's business and thereafter be precluded from employing such thoughts when they are not trade secrets." *Id.* at 767. "An employer is only entitled to restrain a former employee from disclosing and using confidential information which was developed as a result of the employer's initiative and investment and which the employee learned as a result of the employment relationship." *Id.* at 768. The court next adopted a two-part test to determine whether an employee who formed a competing enterprise with his former employer has used general knowledge or trade secrets:

First, did the employees derive the necessary knowledge to make their products from their employment with plaintiff or from their general knowledge of the arts of manufacture? Second, could the defendants proceed as they did independently of the knowledge gained as plaintiff's employee? If the answer to these tests is in the affirmative, the former employees relied upon general skill and not upon trade secrets of the former employer. [*Id.* at 769 (citing *Head Ski Co. v. Kam Ski Co.*, 158 *F.Supp.* 919 (D.Md.1958)).]

Regarding the validity of the contractual provision requiring the employee to disclose and assign all ideas and improvements for five years following termination of employment, the court articulated a three-part test consistent with the principles or our decisions in *Solari* and *Whitmyer:*

1) Is the restraint reasonable in the sense that it is no greater than necessary to protect the employer in some legitimate interest?

2) Is the restraint reasonable in the sense that it is not unduly harsh and oppressive on the employee?

3) Is the restraint reasonable in the sense that it is not injurious to the public? [*GTI Corp. v. Calhoon, supra,* 309 *F.Supp.* at 773 (citing *Briggs v. Butler,* 140 *Ohio St.* 499, 45 *N.E.*2d 757 (1942)).]

After balancing these criteria, the court held that the five-year restraint was void as against public policy. The court relied on the fact that the employee had originally been hired from a competitor and that his experience had been limited to one field of engineering design only, thus limiting any future employment opportunities. *GTI Corp. v. Calhoon, supra,* 309 *F.Supp.* at 773.

The United States Court of Claims refused to enforce a one-year holdover clause for an invention of an improved cargo trailer in *Dorr–Oliver, Inc. v. United States,* 432 *F.*2d 447, 193 *Ct.Cl.* 187 (1970). There, the court held that where the inventor had not previously worked on cargo trailers and was not shown to have had knowledge of his former employer's activities relating to that product, the cargo trailers were not includable as part of the subject matter that the inventor agreed to assign back to the former employer after termination. *Id.* 432 F.2d at 451–52. The court interpreted the term "subject matter" to mean those areas of technical endeavor in which the inventor actually worked while employed by the company. The court reasoned:

Hold-over clauses in employment contracts are enforceable only if they consti-- tute a reasonable and justifiable restriction on the right of employees to work in their profession for subsequent employers. *Guth v. Minnesota Mining & Mfg. Co.,* 72 F.2d 385 (7th Cir.1934); IV Walker, Patents § 374 (Deller's 2d ed. 1965). *See also* Knoth, "Assignment of Future Inventions," 27 Chi.–Kent L.Rev. 295 (1949). Their legitimate purpose is to prevent an employee from appropriating to his own use or to the use of a subsequent employer inventions relating to and stemming from work done for a previous employer. Hold-over clauses are simply a recognition of the fact of business life that employees sometimes carry with them to new employers inventions or ideas so related to work done for a former employer that in equity and good conscience the fruits of that work should belong to the former employer. In construing and applying hold-over clauses, the courts have held that they must be limited to reasonable times (*Guth, supra*) and to subject matter which an employee worked on or had knowledge of during his employment. *Universal Winding Co. v. Clarke,* 108 F.Supp. 329 (D.Conn.1952). Unless expressly agreed otherwise, an employer has no right under a hold-over clause to inventions made outside the scope of the employee's former activities, and made on and with a subsequent employer's time and funds. *Gas Tool Patents Corp. v. Mould,* 133 F.2d 815 (7th Cir.1943). [*Dorr–Oliver v. United States, supra,* 432 *F.*2d at 452.]

Similarly, in *Armolite Lens Co. v. Campbell*, 340 *F.Supp.* 273 (S.D.Cal.1972), the court interpreted a one-year holdover agreement requiring the former employee to assign "all new ideas and concepts I may have concerning the field of work of the company, its products ... which might be of value to the company ... for example a new product, new methods or process, or an improvement in an old product...." Relying on *Winston Research Corp. v. Minnesota Mining & Mfg. Co.*, 350 *F.*2d 134 (9th Cir.1965), the *Armolite* court held that the agreement was valid as it related to ideas and concepts that were based on trade secrets or proprietary information of the employer. Concerning new designs derived from general knowledge, however, the court held that

> [t]o require a former employee, who has developed a new idea or concept following the termination of his employment and which is not based upon the employer's secrets or confidential information, to turn over the fruits of his labors to his former employer constitutes, in the opinion of this Court, an unreasonable restraint of trade. [*Armolite Lens Co. v. Campbell, supra*, 340 *F.Supp.* at 275.] [3]

*See also Universal Winding Co. v. Clarke*, 108 *F.Supp.* 329 (D.Conn.1952) (court applied the traditional *Solari/Whitmyer* balancing approach to employee noncompetition clauses, weighing the competing interests of the employee, employer, and public, and upheld holdover agreement that required employer to assign an invention that he might design within one year of the termination of his employment that was broadly "related to" any subject matter of his employment).

Regardless of the results reached in the individual cases, all courts recognize the competing interests at stake. That is, the

---

[3]Although the more recent cases indicate that an assignment agreement that is so overbroad as to be unreasonable or repugnant to public policy will not be enforced, several earlier decisions enforced such agreements as a requisite to the protection of the employer's business. *See, e.g., Goodyear Tire & Rubber Co. v. Miller*, 22 *F.*2d 353 (9th Cir.1927); *Conway v. White*, 9 *F.*2d 863 (2nd Cir.1925); *Chadeloid Chem. Co. v. H.B. Chalmers Co.*, 243 *F.* 606 (2nd Cir.1917); *Hulse v. Bonsack Mach. Co.*, 65 *F.* 864 (4th Cir.1895); *Dry Ice Corp. v. Josephson*, 43 *F.*2d 408 (E.D.N.Y.1930); *Consolidated Ry. Elec. Lighting & Equip. Co. v. United States Light & Heating Co.*, 77 *N.J.Eq.* 285 (Ch.1910).

question of the enforceability of holdover covenants clearly presents the interest of the employee in enjoying the benefits of his or her own creation, on the one hand, and the interest of the employer in protecting confidential information, trade secrets, and, more generally, its time and expenditures in training and imparting skills and knowledge to its paid work force, on the other. Moreover, courts recognize that the public has an enormously strong interest in both fostering ingenuity and innovation of the inventor and maintaining adequate protection and incentives to corporations to undertake long-range and extremely costly research and development programs.

## IV

The cases thus support the enforceability of holdover agreements if they are reasonable. In assessing the reasonableness of holdover agreements, this Court will follow the *Solari/Whitmyer* test of reasonableness. By applying the reasonableness test, the judicial analysis of holdover agreements will parallel the judicial analysis of contracts requiring an employee to assign to the employer inventions made or conceived of by an employee *during* his or her employment. We have held such contracts to be enforceable when reasonable. *Misani v. Ortho Pharmaceutical Corp.*, 44 *N.J.* 552, *appeal dismissed,* 382 *U.S.* 203, 86 *S.Ct.* 398, 15 *L.Ed.*2d 270 (1965). Likewise, we will enforce holdover agreements to the same extent that we will enforce similar post-employment restrictive agreements, giving employers "that limited measure of relief within the terms of the noncompetitive agreement which would be reasonably necessary to protect his 'legitimate interests,' would cause 'no undue hardship' on the employee, and would 'not impair the public interest.'" *Whitmyer Bros., Inc. v. Doyle, supra,* 58 *N.J.* at 35; *Solari Indus., Inc. v. Malady, supra,* 55 *N.J.* at 585.

The first two parts of the *Solari/Whitmyer* test focus on the protection of the legitimate interests of the employer and

the extent of the hardship on the employee. Plainly, the court must balance these competing interests. In cases where the employer's interests are strong, such as cases involving trade secrets or confidential information, a court will enforce a restrictive agreement. *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 *N.J.* 235 (1949). Conversely, in cases where the employer's interests do not rise to the level of a proprietary interest deserving of judicial protection, a court will conclude that a restrictive agreement merely stifles competition and therefore is unenforceable. See *Whitmyer Bros., Inc. v. Doyle, supra*, 58 *N.J.* at 35; *Irvington Varnish and Insulator Co. v. Van Norde*, 138 *N.J.Eq.* 99, 106 (E. & A. 1946) (Bodine, J., dissenting). Courts also recognize that knowledge, skill, expertise, and information acquired by an employee during his employment become part of the employee's person. "They belong to him as an individual for the transaction of any business in which he may engage, just the same as any part of the skill, knowledge and information received by him before entering the employment." von Kalinowski, "Key Employees and Trade Secrets," 47 *Va.L.Rev.* 583, 586 (1961). An employee can use those skills in any business or profession he may choose, including a competitive business with his former employer. Courts will not enforce a restrictive agreement merely to aid the employer in extinguishing competition, albeit competition from a former employee. Ultimately, the consuming public would suffer from judicial nurturing of such naked restraints on competition.

At the same time, we recognize that employers have a right to protect their trade secrets and other confidential information. Initially, of course, employers can rely on the patent laws and their common law derivatives as a foundation for protecting their patented goods and trade secrets.[4] Beyond such protec-

---

[4]We note that plaintiff does not directly attack defendant's patents or claim infringement of its own. Further, we find no basis for overturning the factual

tions, employers may protect themselves contractually from the misappropriation of other company information by former employees. Through contract, an employer may protect its legitimate interest in preventing employees from using the thoughts and ideas generated by the employee and fellow workers while being paid by and using the resources of the employer to invent a product that directly competes with the employer's product.

Most courts have limited the legitimate protectible interests of an employer "to trade secrets and other proprietary information ... and customer relations." *See, e.g., Solari Indus., Inc. v. Malady, supra; Whitmyer Bros., Inc. v. Doyle, supra.* The rationale offered for such a limitation is the broad definition of trade secret and other confidential information. There is no exact definition of a trade secret.[5] Generally, cases rely on the broad definition of trade secret found in the *Restatement of Torts* § 757 comment b (1939):

> b. Definition of trade secret. A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers.

---

findings made by the trial court. The trial court made two specific factual findings on this issue:

> (g) There is no evidence that defendant pirated trade secrets or utilized confidential information.
> (h) There is no evidence that plaintiff's friction stabilizer involved trade secrets. The principles involved in the stabilizer's functioning had been freely discussed by Dr. Scott [the inventor of the friction stabilizer] and others. The specifications and methods of manufacture are easily discoverable. [210 *N.J.Super.* at 354–55.]

[5]The Code of Criminal Justice defines "trade secret" as follows:

> "Trade secret" means the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula or improvement which is secret and of value. A trade secret shall be presumed to be secret when the owner thereof takes measures to prevent it from becoming available to persons other than those selected by the owner to have access thereto for limited purposes. [*N.J.S.A.* 2C:20–1i.]

The Restatement also lists six factors to determine whether a given idea or information is a trade secret: (1) the extent to which the information is known outside of the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Restatement of Torts* § 757 comment b. In sum, a trade secret need not be novel, inventive, or patentable, and may be a device that is clearly anticipated in the prior art or one that is merely a mechanical improvement that a good mechanic can make. However, it may not be part of the general knowledge or information of an industry or a matter of public knowledge. *See Koehring Co. v. E.D. Etnyre & Co.*, 254 *F.Supp.* 334, 361 (N.D.Ill.1966).

Ciavatta urges that holdover agreements also should be enforced only when the former employee has used the trade secrets or confidential information of the employer in developing his post-termination invention. Since it is undisputed that he did not do so in inventing his stabilizer, he argues, paragraph 1(c), the holdover clause, should not be enforced against him.

Ingersoll–Rand, however, argues that it is inequitable to limit an employer's "protectable interest" solely to trade secrets and other confidential information. Today, large corporations maintain at great expense modern research and development programs that involve synergistic processes. Such "think tanks" require the free and open exchange of new ideas among the members of a research staff using the employer's body of accumulated information and experiences. This creative process receives its impetus and inspiration from the assimilation of an employer's advanced knowledge and a spontaneous interaction among colleagues, co-employees, and superiors. Inger-

soll–Rand argues that it maintains this creative atmosphere in its research and development effort at great expense and that it should be allowed to protect itself against a former employee who invents a unique, competing concept attributable to such brainstorming. Ingersoll–Rand contends that such creative brainstorming enriched Ciavatta and led to his invention and therefore that paragraph 1(c) of the proprietary agreement should be enforced.

■ We agree with Ingersoll–Rand that the protection afforded by holdover agreements such as the one executed by the parties in this lawsuit may under certain circumstances exceed the limitation of trade secrets and confidential information. We recognize that employers may have legitimate interests in protecting information that is not a trade secret or proprietary information, but highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which the employee has been "exposed" and "enriched" solely due to his employment. We do not attempt to define the exact parameters of that protectable interest. *Cf. E.I. DuPont De Nemours Powder Co. v. Masland,* 244 *U.S.* 100, 37 *S.Ct.* 575, 61 *L.Ed.* 1016 (1917) (the term "property" is incapable of precise definition in trademark cases).

We expect courts to construe narrowly this interest, which will be deemed part of the "reasonableness" equation. The line between such information, trade secrets, and the general skills and knowledge of a highly sophisticated employee will be very difficult to draw, and the employer will have the burden to do so. Nevertheless, we do not hesitate to recognize what appears to us a business reality that modern day employers are in need of some protection against the use or disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enter-

prise. See Stedman, "Rights and Responsibilities of the Employed Inventor," 45 *Ind.L.J.* 254, 259 (1970).

█ Courts, however, must be aware that holdover agreements impose restrictions on employees. Such agreements clearly limit an employee's employment opportunities and in many instances probably interfere with an employee securing a position in which he could most effectively use his skills, at the same time depriving society of a more productive worker. How restrictive the clause is on a particular employee depends, of course, on the facts and circumstances of the case. Indeed, in many instances, the employee may have little choice but to sign a holdover agreement in order to secure employment. Conversely, some very talented or experienced individuals, pursued by several corporations, may bargain for highly lucrative positions in exchange for their promise to be bound by a holdover agreement. Accordingly, courts must evaluate the reasonableness of holdover agreements in light of the individual circumstances of the employer and employee. Courts must balance the employer's need for protection and the hardship on the employee that may result.

█ The third prong of the *Solari/Whitmyer* test relates to the public interest. Throughout this opinion, we have analyzed the relevant competing public interests. We reiterate that the public has a clear interest in safeguarding fair commercial practices and in protecting employers from theft or piracy of trade secrets, confidential information, or, more generally, knowledge and technique in which the employer may be said to have a proprietary interest. The public has an equally clear and strong interest in fostering creativity and invention and in encouraging technological improvement and design enhancement of all goods in the marketplace. *See* von Kalinowski, "Key Employees and Trade Secrets," *supra*, 47 *Va.L.Rev.* at 584. The competing public interests are also evident from the current debate raging in the scientific community about the effect of secrecy in scientific research arising from increased

ties between scientists, commercial enterprises, and the government, and the effect of such secrecy on the long term progress of scientific programs and innovations. Broad, "As Science Moves Into Commerce, Openness Is Lost," *N.Y. Times*, May 24, 1988, at Cl, col. 5.

In sum, we conclude that holdover agreements are enforceable when reasonable, and that in determining if the post-termination restriction is reasonable, we will apply the three-prong test of *Solari/Whitmyer*. Thus, resolution of each case will depend on its own facts and circumstances. Courts must not go too far in construing holdover agreements to insulate employers from competition from former employees. That courts should not be overly zealous in protecting employers should not, however, dissuade a court from analyzing the reasonableness of a holdover covenant or from enforcing it where it is reasonable. Thus, here, we must balance the interests of Ingersoll–Rand and Ciavatta on the basis of the facts to determine whether the enforcement of the holdover agreement in this instance would be reasonable.

# VI

We conclude that on the facts of this case, Ingersoll–Rand is not entitled to an assignment of the patent on Ciavatta's friction stabilizer. We find that Ingersoll–Rand has not substantiated that Ciavatta invented his friction stabilizer in violation of his contractual obligation under the holdover clause. Ingersoll–Rand has not established that Ciavatta "conceived" of his invention as a result of his employment at Ingersoll–Rand. The facts convince us that the holdover clause does not apply here however liberally we are willing to construe the protection afforded employers by such clauses. Furthermore, we also find that enforcement of the holdover agreement in this case would be unreasonable even if the contract by its terms applied to Ciavatta's invention.

The record shows that Armand Ciavatta was not hired to invent or to work on design improvements or other variations of the split set friction stabilizer. He was not directed by his employer into its research and development department, and even though Ciavatta himself submitted numerous product ideas to Ingersoll–Rand, the company never developed any of those ideas. Indeed, Ciavatta testified that as a result of plaintiffs' rejection of his submitted ideas, he was discouraged from creating or using his ingenuity to develop new ideas or suggest adaptations to existing Ingersoll–Rand products. Ingersoll–Rand did not assign Ciavatta to a "think tank" division in which he would likely have encountered on a daily basis the ideas of fellow Ingersoll–Rand personnel regarding how the split set stabilizer could be improved or how a more desirable alternative stabilizer might be designed.

More importantly, the information needed to invent the split set stabilizer is not that unique type of information that we would deem protectable even under our expanded definition of a protectable interest. All of the specifications and capabilities of the Ingersoll–Rand split set stabilizer were widely publicized throughout industry and trade publications. In fact, the general design of Atlas Copco's friction stabilizer, the leading competitor of the Ingersoll–Rand stabilizer, is identical to the general design of the Ingersoll–Rand product. Moreover, Ingersoll–Rand openly advertised the characteristics of its split set product. The uses of the product were well known throughout the mining industry as were the names of the particular users of the product. Production cost figures and pricing schedules were known in the industry as well. Furthermore, the technology behind the split set was no mystery; there was trial testimony that the technology behind the production of the split set was over fifty years old. Thus, it is clear that Ingersoll–Rand has done little to guard the details of its friction stabilizer or maintain a secretive atmosphere surrounding corporate development and marketing of the product. Instead, the company deliberately created and perpetuated an open, public

posture in the mining industry submarket in which it operated and in which it enjoyed a commanding market share. Matters of general knowledge throughout an industry cannot be claimed as secrets nor as "unique information" derived as a result of current, ongoing research of the employer. See *Koehring Co. v. E.D. Etnyre & Co.*, *supra*, 254 *F.Supp.* at 361; Blake, "Employee Agreements Not to Compete," 73 *Harv.L.Rev.* 625, 671–73 (1960).

Ciavatta did not develop his stabilizer on the basis of valuable information about the Ingersoll–Rand product imparted to him because he held a special position with the company. His departure from Ingersoll–Rand and subsequent invention and development of his own competing product do not suggest that he purposefully left to develop a competing product on the basis of the knowledge he gained from his employment. We do not hold that the manner of an employee's departure is dispositive. It is a factor that the court should consider, however, and, in this case, that factor weighs heavily in defendant's favor. Ciavatta was fired from Ingersoll–Rand and testified that he conceived of his invention while installing a light fixture at his home some months after he was terminated. Thereafter, he performed further, independent calculations to test and refine his concept. He worked intermittently on the product as he searched for employment. He developed the product based on his general skill, expertise, and knowledge. While Ciavatta employed certain skills and knowledge he undoubtedly gained during his employment by Ingersoll–Rand, his invention was not the result of any research currently being done by the company or any company research in which he personally was involved. Indeed, the technology Ciavatta employed was developed over fifty years ago and well known in the industry. Nor did he use any of Ingersoll–Rand's capital or materials in the development of his invention. When his attempts to lure capital failed, he borrowed and used his own savings to get the small business started.

These facts lead us to believe that the factors of the *Solari/Whitmyer* balancing test weigh heavily in favor of defendant, even assuming that paragraph 1(c) applies. Although we specifically hold today that reasonable holdover agreements may be enforceable, we decline to enforce the agreement between Ingersoll–Rand and Ciavatta because, as it relates to the patented invention in dispute, the restriction is unreasonable under *Solari/Whitmyer*.[6] We recognize that employers may have a protectable interest in certain proprietary information that former employees may use to invent competing products. We also recognize that the range of the employer's proprietary information that may be protected by contract may narrowly exceed the specific types of information covered by the law of trade secrets and confidential information. Here, however, when we apply the reasonableness test of *Solari/Whitmyer*, we conclude that enforcement of the holdover agreement would work an undue hardship on defendant. Thus, we conclude that the restraint in this specific case is unreasonable and hence unenforceable.

Accordingly, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

---

[6]As an aid to employer's drafting future holdover agreements, we emphasize the following language of Paragraph 1(c) that applies the agreement to "inventions, copyrights and/or designs * * * if conceived as a result of and is attributable to work done during such employment and *relates to a method, substance, machine, article of manufacture or improvements therein within the scope of the business of the COMPANY or any of its affiliates.*" (emphasis added). Ingersoll–Rand has thirty divisions worldwide, so arguably the clause could apply to activities outside the scope of Ciavatta's employment but within the scope of any of those numerous divisions. We caution employers that such language appears to be overly broad, and, hence, would be unenforceable.